C.J. OSTALKIEWICZ et al.

v.

GUARDIAN ALARM, DIVISION OF
COLBERT'S SECURITY
SERVICES, INC.

No. 85–259–A.

Supreme Court of Rhode Island.

Jan. 28, 1987.

James T. McCormick, Vincent T. Santaniello, Providence, for plaintiffs.

Kenneth P. Borden, Higgins Cavanagh & Cooney, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on cross-appeals from orders and rulings made by the trial justice granting a motion for new trial, declining to grant a motion for directed verdict on the issue of fraud, and limiting damages on the issues of breach of contract and negligence. We affirm in part and reverse in part. The pertinent facts of the case are as follows.

C.J. Ostalkiewicz and his wife, Cynthia (hereinafter referred to as C.J. and Cynthia), operated a jewelry business in the town of North Providence in a showroom located in a garage attached to their dwelling house. The business consisted of the sale of diamond and gold jewelry to customers who would view the merchandise by appointment. C.J. contracted on January 31, 1979, with Guardian Alarm, a division of Colbert's Security Services, Inc. (Guardian), for the installation and maintenance of a burglar-and-holdup-alarm system. The contract provided that the alarm system would remain the property of Guardian and that C.J. agreed to pay $775 for the cost of connecting and installing the system, plus a service charge of $60 per month for the operation of the system. The agreement was for a term of one year, with provision for automatic renewal unless one of the parties gave written notice of cancellation at least ninety days before the end of the term.

The contract also provided that Guardian was not to be an insurer and that it would not be liable "for any loss occasioned by malfeasance or misfeasance in the performance of the System or of the services under this Agreement or for any loss or damage sustained through burglary, theft, robbery, fire or other cause * * *." The agreement further provided that any liability that was due to the negligence of Guardian or otherwise should be limited to "the greater of a sum equal in amount to the monthly service charge provided * * * for a period of service of six months or $250."

The holdup alarm, sometimes referred to as a silent alarm, was a button that was to be pushed in the event of robbery. This button then was expected to send a signal to Guardian's central monitoring station, whereupon the police would be notified. The installation was serviced from time to time by Guardian's personnel, and apparently no defect was ever discovered. On February 2, 1980, a robbery occurred at plaintiffs' place of business. C.J. pressed the silent alarm, but the system did not work. Two robbers were on the premises for approximately twenty minutes. They tied up Cynthia and a customer, ransacked the storeroom including the safe, and escaped with a great deal of the owners' merchandise. After punching the alarm, C.J. hid in a closet in the office and was not discovered by the robbers.

Investigation by the police disclosed that Guardian's personnel had failed to program its computer so as to receive a signal in the event that the holdup button was pushed. Consequently, monitoring personnel did not become aware that the alarm device had been pressed and that a robbery was in progress.

The plaintiffs filed a seven-count complaint, of which counts 1, 2, and 3 were brought in C.J.'s name alone and the remaining four counts were brought in the names of both plaintiffs. Counts 1, 2, and 3, involving contract and negligence claims, were submitted to the jury. Directed verdicts were rendered against both C.J. and Cynthia on count 4 alleging strict liability, on count 6 alleging negligent misrepresentation, and on count 7 alleging violation of the consumer-protection statute. Also, a directed verdict was rendered against Cynthia on count 5 alleging fraud. Thus, the fraud count insofar as it applied to C.J was submitted to the jury along with the contract and negligence counts. The trial justice instructed the jury that if they found for C.J. on the contract and negligence

counts (1, 2, and 3), they could award damages not exceeding $360, the amount to which liability had been limited in the contract. He instructed the jury that if they found for C.J. on the fraud count (5), they could award the full amount of the damages. The jury rendered a verdict in favor of C.J. on the breach of contract and negligence counts for the amount of $360 and also rendered a verdict in favor of C.J. on the fraud count for the amount of $491,147.

Both parties raise a number of issues on appeal. These issues will be considered in the order of their significance to this opinion and not necessarily in the order raised in the parties' briefs.

## I

## THE LIMITATION OF LIABILITY ISSUE

C.J. contends that the trial justice was wrong in limiting the liability of Guardian to the sum of $360, an amount equivalent to six months service charge in accordance with the contract. He contends that this clause was invalid as against public policy. Such clauses limiting liability in connection with burglar alarms have been considered in a number of jurisdictions. In almost every instance such clauses have been upheld.

An example of the reasoning of such cases may be found in *Fireman's Fund American Insurance Cos. v. Burns Electronic Security Services, Inc.*, 93 Ill. App.3d 298, 48 Ill.Dec. 729, 417 N.E.2d 131 (1981). In that case, burglars had stolen $800,000 worth of jewelry from Henry Kay Jewelers. Kay's insurer, Fireman's Fund, had paid the loss in accordance with its policy and was subrogated to Kay's right against Burns. As in the present case, the contract between Kay and Burns provided for a limitation of liability in the amount of $250. Fireman's Fund challenged this limitation as an exculpation clause that was unconscionable and therefore unenforceable. In response to this argument, the court observed:

"The terms of this contract belie unconscionability. The chance of a burglary and the potential loss depended not only on the quality of the alarm but on many factors peculiar to Henry Kay and within Henry Kay's knowledge and control. For example, the type and quantity of merchandise in the store, perhaps the prime motivation for a [break-in], was for Henry Kay to determine, not Burns. It was not unreasonable for Burns to feel that the jeweler was better able than itself to buy any desired amount of insurance at appropriate rates. Burns could properly insist on the exculpation clause to make certain that the risk of a burglary lay on the jeweler, not on Burns. It should also be noted that the product was designed to outwit the ever-advancing burglary profession. The risk that the protection provided by the alarm system would not be enough was substantial regardless of how good the particular alarm was.

"Allocating the risk to Henry Kay was thus not a bargain 'which no man in his senses, not under delusion, would make * * * and which no fair and honest man would accept' * * *. It does not suggest unfair surprise or oppression * * *. On the contrary, the exculpation clause was a commercially sensible arrangement, and the plaintiff is bound by it." 93 Ill.App.3d at 299, 48 Ill.Dec. at 730–31, 417 N.E.2d at 132–33.

Another case closely analogous to the case at bar is *St. Paul Fire & Marine Insurance Co. v. Guardian Alarm Co.*, 115 Mich.App. 278, 320 N.W.2d 244 (1982). There, a loss was sustained by FLX Corporation as a result of a burglary during which the alarm system had not operated properly. The insurer for FLX brought suit against Guardian, which countered with a limitation of liability clause almost identical to that in the case at bar. The insurer challenged the limitation of liability clause on public policy grounds. The court held that both parties to the contract had dealt at arm's length and that a contract clause limiting Guardian's liability to the

aggregate of six monthly payments or $250 was "manifestly reasonable" in the circumstances of the case. The court pointed out that Guardian was not in the insurance business; rather, it provided an alarm service for a specific sum that was "not a premium for theft insurance." Therefore, the court held that a clause limiting defendant's liability in the event the alarm system did not work properly is not unconscionable. The court further held that the contract was not one of adhesion and that the parties entered into the contract fully aware of its terms.

Similar holdings may be found by courts in Arizona, *Central Alarm of Tucson v. Ganem*, 116 Ariz. 74, 567 P.2d 1203 (Ct. App.1977); California, *Better Food Markets, Inc. v. American District Telegraph Co.*, 40 Cal.2d 179, 253 P.2d 10 (1953); District of Columbia, *Bargaintown of D.C., Inc. v. Federal Engineering Co.*, 309 A.2d 56 (D.C.Ct.App.1973); Massachusetts, *New England Watch Corp. v. Honeywell, Inc.*, 11 Mass.App.Ct. 948, 416 N.E.2d 1010 (1981); New Hampshire, *Shaer Shoe Corp. v. Granite State Alarm, Inc.*, 110 N.H. 132, 262 A.2d 285 (1970); and Pennsylvania, *Lobianco v. Property Protection, Inc.*, 292 Pa.Super. 346, 437 A.2d 417 (1981). The foregoing are only illustrative of cases in which such exculpatory or limitation of liability clauses have been upheld.

█ In the case at bar, there is no question that C.J. examined the contract and read it before signing. He dealt at arm's length with Guardian. It was obvious under the contract that Guardian was not an insurer. Indeed, it is apparent in this case that plaintiffs were insured, though apparently not in the amount that they found fully compensatory for the damages sustained. We are of the opinion that in the circumstances of this case the limitation of liability was not violative of public policy, nor was it unconscionable. The trial justice was correct in his limiting instructions to the jury on the relevant counts of the complaint for breach of contract and negligence.

II

THE FRAUD ISSUE

Both Cynthia and C.J. claimed in count 5 of their complaint that agents of Guardian had made deliberate misrepresentations of fact concerning the working and operational reliability of the silent-alarm system. They alleged that these misrepresentations were false and known to be false by those who made them.

█ The trial justice, after considering the testimony of Cynthia, determined that it was insufficient to create a jury question on the issue of deliberate and fraudulent misrepresentation. We have examined Cynthia's testimony, and even though it is apparent that she accepted general statements from agents of defendant, Guardian, that the system was in working order after having been repaired on various occasions, there is nothing in her testimony, even viewed in the light most favorable to her and drawing all reasonable favorable inferences therefrom, that those who made statements concerning the operational condition of the system knew at the time that they were making them that the robbery-alarm button was not programmed into the computer, as eventually was found to be the case. Consequently, we are of the opinion that the trial justice did not err in granting a directed verdict against Cynthia on this count.

Guardian contends that the trial justice was in error in declining to grant a directed verdict in respect to C.J. on this same count. Both parties are in agreement that when passing upon a motion for directed verdict, the court must view the evidence in the light most favorable to the party opposing the motion. Moreover, the trial justice must draw all reasonable favorable inferences from such evidence in determining whether a question of fact is presented that might be decided in that party's favor by a rational jury. *Bitgood v. Allstate Insurance Co.*, 481 A.2d 1001 (R.I.1984);

*Welsh Manufacturing v. Pinkerton's Inc.,*
474 A.2d 436 (R.I.1984).

■ In examining the evidence, and particularly the testimony of C.J. in light of the foregoing standard, we are of the opinion that this testimony was adequate to survive a motion for directed verdict on the issue of fraud. C.J.'s testimony, if believed, as it must be for purposes of a motion for directed verdict, was sufficient to raise a question of fact concerning specific assurances given to him by agents of Guardian. He reiterated in his testimony that he had specifically asked agents of Guardian on more than one occasion whether the holdup alarm was working. He also testified that he received repeated assurances that the alarm button was, in fact, operative. This testimony, when viewed in its most favorable light, could give rise to an inference that the agent or agents of Guardian who rendered such assurances were misrepresenting a known factual condition upon which they had every reason to believe that C.J. would rely. Consequently, the trial justice did not err in declining to grant a directed verdict for Guardian on the fraud count as it applied to C.J.

### III

### THE MOTION FOR NEW TRIAL

The plaintiffs contend that the trial justice was in error in granting a motion for new trial in respect to all issues of liability and damages. First, we should consider the granting of a motion for new trial on the fraud count. We have pointed out that the testimony of C.J. was sufficient to survive a motion for directed verdict. Consequently, we have determined that a question of fact was presented to the jury. The jury resolved that question of fact in favor of C.J.

Thereafter, on motion for new trial the trial justice, in accordance with the duty imposed upon him by *Barbato v. Epstein,* 97 R.I. 191, 196 A.2d 836 (1964), and its progeny, reviewed the evidence, exercised his independent judgment thereon, and made certain determinations of fact in respect to the credibility of the testimony of C.J. in light of certain impeaching evidence and contradictory testimony given by employees of Guardian. The principal thrust of the trial justice's factual determinations on this issue may be best understood from the following excerpt taken from his decision on the motion:

"Now the key to this case, at least as to the fraud claim, is the testimony of the plaintiff. He said that subsequent to the installation, the service personnel of the defendant visited his premises approximately twelve times or about twice a month, as he puts it, and that on each and every occasion he asked them whether the holdup button was tested and he was told that it was tested and working. That was the plaintiff's testimony essentially when he was first on direct examination. Now that testimony changed during the course of the trial. He took the stand several more times during the course of the trial and his testimony was changed in this respect, in my view, to fit the circumstances of the case at that particular time. For example, after he heard the testimony of Williams, who testified that he answered two or three service calls and that no signal at all was being received at the defendant's central station because there was something wrong with the phone line, Mr. Ostalkiewicz then pointed out that, of course, on those occasions he did not ask about testing because he knew the system was not operational. In viewing all this evidence I come to the conclusion, as a seventh juror, that at no time after installation, and Weber's testing on the afternoon this installation was complete, did any personnel of the defendant test the holdup button and state to the plaintiff or his wife that the holdup button was tested and was operational. In other words, I conclude from this evidence that no representation was ever made during this whole period after installation by anyone from the defendant that this holdup system was tested and work-

ing. I am referring specifically to the holdup button. I do not believe Mr. Ostalkiewicz when he states that the holdup button was tested on numerous occasions and that he was told by personnel of the defendant that it was tested and working."

It is abundantly clear from the statements of the trial justice that he did not believe C.J.'s testimony concerning alleged assurances given to him by agents of Guardian that they had tested the alarm button and found it to be functional. The trial justice was persuaded not only by prior inconsistent statements made to the police by C.J. but also by what he deemed to be straightforward and credible testimony of other witnesses. We have reiterated our rule on many occasions concerning the duty of a trial justice in responding to a motion for new trial. In the case at bar, there is no question that the trial justice carefully reviewed the evidence on this issue and concluded that C.J.'s testimony was not credible. We have also frequently stated that the findings of fact made pursuant to a motion for new trial after the exercise of independent judgment will be entitled to great weight and will not be set aside unless the trial justice overlooks or misconceives relevant evidence on a controlling issue or is otherwise clearly wrong. *Gallo v. Arnold,* 476 A.2d 118 (R.I.1984); *Puc v. Leaseway of New England,* 121 R.I. 149, 396 A.2d 940 (1979); *Morinville v. Morinville,* 116 R.I. 507, 359 A.2d 48 (1976).

■ After reviewing the record in this case, we are of the opinion that the trial justice has neither overlooked nor misconceived relevant evidence, nor was he otherwise clearly wrong. The plaintiffs argue that the trial justice did not consider Cynthia's testimony relevant to this issue. Obviously the trial justice committed no error in not considering Cynthia's testimony on this issue pursuant to the motion for new trial. He had already correctly determined that her testimony did not even raise a question of fact in regard to fraud. Conse-

quently, he did not err in declining to review her evidence on the motion for new trial. The plaintiffs have failed to persuade us that the trial justice was wrong in granting the motion for new trial on the fraud issue.

Since the trial justice granted a motion for new trial on the liability aspect of the fraud question, it is unnecessary for us to consider his findings in respect to the excessive amount of damages awarded to C.J. under the fraud count. Obviously the question of damages will be open in the event that the triers of fact should find liability on this count in a second trial.

■ In turning to the propriety of the trial justice's grant of a new trial on the contract and negligence counts, we note that the trial justice found as a fact on the motion for new trial that "[t]here is absolutely no question there was a colossal blunder by someone in the defendant's organization." He went on to state that the failure to put plaintiffs' data into the computer was a tremendous blunder because when the robbery took place and C.J. used the holdup button, the message simply did not "come onto the screen and the phone call to the police was never made." This finding in effect buttressed the jury's verdict on the three counts that had been submitted to it on the issue of breach of contract and negligence. The trial justice had limited the award of damages on these counts to $360, the amount to which liability had been limited in the contract. The jury followed his limiting instructions and rendered a verdict on counts 1, 2, and 3 in that amount. There seems no basis for the trial justice's granting of a new trial on those issues. Judgment for C.J. should have been allowed to stand in the amount of $360 on those counts. Although the motion for new trial was properly granted on the fraud count, there seems no reason to require plaintiff again to prove within the context of a new trial that Guardian was negligent and failed to carry out its contractual obligations within the limit of the $360 exposure. Consequently, the trial

justice erred in vacating the judgment in regard to the counts alleging breach of contract and negligence.

## IV

### OTHER ISSUES

The plaintiffs have attempted to raise other issues in their reply brief. These issues included the standard of proof in a fraud case and the direction of a verdict on a count alleging a negligent misrepresentation, in addition to the issues previously dealt with in this opinion.

■ Although the granting of a motion for new trial on the fraud issue rendered the instructions given by the trial justice moot, we shall observe for the guidance of the next trial justice that we have held in *Cambrola v. Kaiser Aluminum & Chemical Corp.*, 416 A.2d 694 (R.I.1980), that fraud in a civil suit need only be proven by a fair preponderance of the evidence. *See also Halpert v. Rosenthal*, 107 R.I. 406, 267 A.2d 730 (1970).

■ In respect to the directing of a verdict on the issue of negligent misrepresentation, we are of the opinion that assuming without deciding that a separate or a distinct action might be brought for negligent misrepresentation, it would be subject to the limitation of liability clause in the contract and thus would come within the damages already awarded on the contract and negligence counts. Thus, plaintiffs were not prejudiced by the granting of this directed verdict, whether or not it was erroneous.

We have considered additional arguments raised by the plaintiffs and find that they are without merit.

For the reasons stated, the plaintiffs' appeal is denied in part and sustained in part. All orders of the trial justice are affirmed, save his order granting a new trial on the contract and negligence counts (1, 2, and 3). The papers in the case may be remanded to the Superior Court with directions to enter judgment for C.J. in the amount of $360 on the foregoing counts and for a new trial for C.J. alone on the fraud count.