**BANCO TOTTA e ACORES, Plaintiff,**

v.

**FLEET NATIONAL BANK, Defendant.**

**Civ. A. No. 89–0220L.**

United States District Court,
D. Rhode Island.

July 3, 1991.

Eugene Scheiman, Thomas Fellig, Baer Marks & Upham, New York City, George Vetter, Vetter & White, Providence, R.I., for plaintiff.

Richard F. Ziegler, Cleary, Gottlieb, Steen & Hamilton, New York City, Richard P. McMahon, McMahon & McMahon, Providence, R.I., for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This matter is before the Court on cross motions for summary judgment, and on defendant's motion to dismiss Count 1 of plaintiff's complaint based upon the pleadings, pursuant to Fed.R.Civ.P. 12(c). The dispute concerns an $18 million commercial loan issued by Fleet National Bank ("Fleet") to Anthony Liuzzo ("Liuzzo"), a nursing home operator, in 1988. Plaintiff here, Banco Totta e Acores ("BTA"), participated in that loan in the amount of $2 million. Soon after the closing papers were signed, the relationship between Fleet and Liuzzo deteriorated, resulting in Fleet's accelerating the loan on October 27, 1989. The dispute between Fleet and Liuzzo was recently addressed by this Court in *Fleet National Bank v. Liuzzo*, 766 F.Supp. 61 (D.R.I.1991). In this suit against Fleet, BTA attempts to rescind its participation contract with Fleet or recover damages against Fleet for alleged misrepresentations by Fleet about the Liuzzo

loan. Fleet, in turn, counterclaims that BTA violated the terms of the contract executed by the banks.

## FACTUAL BACKGROUND

Building on a relationship started in 1986 when Fleet loaned Liuzzo $1 million, Fleet began negotiations with Liuzzo in 1987 concerning a larger, longer-term credit arrangement. In May 1988, BTA agreed to purchase a $2 million participation in the proposed loan. Several other banks enlisted as participants as well. On July 28, 1988, Fleet and Liuzzo entered into a revolving credit agreement, consolidating approximately $16 million in outstanding debt with $2 million in new credit.

Soon thereafter, Fleet became troubled about some aspects of Liuzzo's business operations, including a New York State grand jury investigation into Medicaid fraud at one of the nursing homes, which actually may have been underway at the time of the loan's closing. In the dispute between Fleet and Liuzzo, Fleet alleges, and Liuzzo vehemently denies, that Liuzzo knew of the investigation before the loan closed and failed to disclose what he knew to Fleet. This dispute led Fleet to attempt to terminate its contract with Liuzzo by urging him to seek financing elsewhere, and eventually, when Liuzzo failed to make a scheduled principal payment, to fully accelerate the loan. In the midst of that dispute, BTA filed suit against Fleet, alleging, among other things, that Fleet knew of the Medicaid fraud investigation and failed to disclose it to BTA. Alternatively, BTA charges that even if Fleet did not know about the investigation when BTA agreed to participate in the loan, BTA justifiably relied on Fleet's assessments of Liuzzo's creditworthiness and suffered pecuniary loss as a result.

## DISCUSSION

### I. *BTA's complaint*

#### A. The counts

BTA's complaint has four counts. In the first count, BTA claims that Fleet breached its "duty of disclosure" by omitting to disclose material information. The duty of disclosure, BTA alleges, is established by policy guidelines for loan participation agreements promulgated by the federal Office of the Comptroller of the Currency. The second count is one for intentional misrepresentation. In its third count, BTA claims that Fleet willfully and wantonly breached its duty of due care and good faith by making material misrepresentations and omissions.[1] The fourth count alleges that Fleet has been unjustly enriched as a result of its refusal to refund to BTA the money BTA contributed to the Liuzzo loan. Counts 1, 2 and 3 refer to alleged material misrepresentations and omissions enumerated earlier in the complaint, including: 1) that Fleet knew that two of Liuzzo's nursing homes were being investigated for Medicaid fraud and that, consequently, Liuzzo was not a good credit risk, but failed to disclose this information to BTA; 2) that Liuzzo told Fleet officials about a Florida newspaper article on the Medicaid investigation, but Fleet failed to tell BTA about the article; 3) that Fleet knew of but failed to tell BTA about an ongoing financial audit of one nursing home being conducted by the State of New York's Department of Social Services; and, finally, 4) that Fleet failed to apprise BTA of the opinion letter provided by Liuzzo's attorney, which mentioned the audit.

The four counts in BTA's complaint and the distinctions among them become somewhat blurred and redefined in BTA's motion and accompanying memoranda of law. The first count emerges as a claim for negligent misrepresentation wherein BTA

---

**1.** The pertinent paragraphs of this count state in full:

76. Pursuant to the terms of the Participation Agreement, the Bank owed BTA a duty of due care and good faith in the exercise of the Bank's duties under the Participation Agreement and in connection with the RCA. [The revolving credit agreement between Fleet and Liuzzo].

77. The Bank willfully and wantonly breached its duty of due care and good faith by, among other things, making the material misrepresentations and omissions described above.

asserts that Fleet failed to provide BTA with adequate information about Liuzzo, according to the standard set in the federal policy guidelines. In one of its memoranda of law [2], BTA refers to the second count as one for "common law fraud or deceit" and the third count as "willful and wanton misconduct." BTA then addresses both counts with a single argument, delineating Fleet's alleged intentional misrepresentations. Though the third count, when outlined in the complaint, hints at a possible breach of contract, this theory has not been pursued by BTA in its subsequent memoranda. In the briefs the third count is treated as a tort claim, and is, for all intents and purposes, indistinguishable from count two, the deceit claim. The fourth count, originally for unjust enrichment, is transformed in the memoranda into a claim for rescission for innocent misrepresentation.[3]

After careful review and analysis of BTA's pleadings and memoranda, the Court concludes that BTA has, in essence, attempted to state three causes of action under Rhode Island law: one for intentional misrepresentation, one for negligent misrepresentation, and one for innocent misrepresentation.

BTA has moved for partial summary judgment, seeking rescission, on the claim for innocent misrepresentation. Fleet has moved to dismiss the negligent misrepresentation claim with a motion for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c). Fleet seeks to dismiss the remaining claims through a summary judgment motion based on Fed.R.Civ.P. 56. Because the Court has reviewed the parties' Participation Agreement in considering BTA's negligent misrepresentation claim, the Court will treat Fleet's 12(c) motion as a motion for summary judgment, as permitted by the Federal Rules of Civil Procedure.[4]

## B. Summary judgment

Fed.R.Civ.P. 56(c) provides the standard for ruling on a motion for summary judgment:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affadavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment may be granted even if some key facts are disputed, as long as those facts, and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the party opposing the motion, support judgment for the moving party. *Continental Casualty Co. v. Canadian Universal Insurance Co.*, 924 F.2d 370 (1st Cir.1991).

## C. The misrepresentation claims

An explication of these three misrepresentation claims under Rhode Island law is now in order. The tort of negligent misrepresentation has never been recognized by the Rhode Island Supreme Court. The Court addressed the claim in passing in *Ostalkiewicz v. Guardian Alarm*, 520 A.2d 563 (R.I.1987), where the plaintiff below had brought a claim for negligent misrepresentation, among other claims, and the trial judge (this writer) directed a verdict for the defendant. On appeal, the Supreme Court began "... assuming with-

---

2. "Banco Totta e Acores' Memorandum in Opposition to Fleet National Bank's Motion for Summary Judgment and for Judgment on the Pleadings".

3. The doctrine of unjust enrichment or quasi contract is clearly inapplicable to this case. That equitable doctrine only applies where there is *no* contract between the parties and the law implies one to prevent the unjust enrichment of one party, and detriment to the other. *Hurdis Realty Inc. v. Town of North Providence,* 121 R.I. 275, 397 A.2d 896 (1979). Here, there is a

Participation Agreement that describes the legal duties of both parties. No implied obligations exist beyond the contract.

4. Fed.R.Civ.P. 12(c) states:
... If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

out deciding that a separate or distinct action might be brought for negligent misrepresentation," then went on to uphold the directed verdict based on the particular facts of the case.

In a federal case governed by Rhode Island law, *Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85 (D.R.I.1986), Judge Pettine allowed an action to lie against an accountant for negligent preparation of financial statements. In describing the tort of negligent misrepresentation, the Court cited the tentative draft of the Restatement (Second) of Torts § 552:

> (1) One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.[5]

The tort of intentional misrepresentation, or, in common law parlance, deceit, is well established in Rhode Island law. It is required that plaintiff prove the following elements: 1) that defendant made a false representation; 2) that defendant intended thereby to deceive the plaintiff; 3) that defendant intended that plaintiff rely on the representation; 4) that plaintiff did rely on the misrepresentation; and 5) that plaintiff was injured as a result. *Cliftex Clothing Co., Inc. v. DiSanto,* 88 R.I. 338, 344, 148 A.2d 273 (1959). In Rhode Island, a party who has been induced by fraud to enter into a contract has a choice of two remedies: he may affirm the contract and seek damages under the tort theory; or he may pursue a remedy under contract law, that is, to rescind the contract and recover what he has paid under it. *Halpert v. Rosenthal,* 107 R.I. 406, 412, 267 A.2d 730 (1970).

In *Halpert,* the Rhode Island Supreme Court expanded the second category of suits, those seeking rescission of a contract based on fraud, to include suits where the plaintiff was induced to enter into the contract by an innocent misrepresentation. *Id.* at 413, 267 A.2d 730. In *Halpert,* a prospective home buyer backed out of a real estate agreement when he discovered that the house was infested by termites. The homeowner then sued the reluctant buyer on the contract. The buyer lodged a counterclaim, asserting that the homeowner had intentionally misrepresented that the house was termite-free during the preagreement negotiation. Though the buyer could produce no evidence to show that the homeowner intended to deceive the buyer with his misstatements, the trial judge denied the homeowner's motion for a directed verdict. The jury found for the would-be buyer and ordered the homeowner to return the downpayment. The Supreme Court affirmed:

> When he denied the plaintiff's motion, the trial justice indicated that a false, though innocent, misrepresentation of a fact made as though of one's knowledge may be the basis for rescission of a contract. While this issue is one of first impression in this state, it is clear that the trial judge's action finds support in the overwhelming weight of decisional and textual authority which has established the rule that where one induces another to enter into a contract by means of a material misrepresentation, the latter may rescind the contract. It does not matter if the representation was "innocent" or fraudulent.

*Id.* at 412–413, 267 A.2d 730. As with a claim for intentional misrepresentation, the plaintiff must show that he justifiably relied on defendant's misrepresentation, and was harmed thereby. *Id.* at 415, 267 A.2d 730.

A claim for innocent misrepresentation is restricted, however, because of the limitations inherent in the remedy of rescission. Rescission is appropriate only when both parties to the contract can be restored to

---

5. This language has been incorporated in the final version of the Restatement (Second) of Torts § 552 (1977).

the status they occupied prior to the contract, *Jakober v. Loew's Theatre, etc.*, 107 R.I. 104, 112, 265 A.2d 429 (1970), "provided no rights of third parties have intervened, and provided that any benefits received under it can be restored, so that the parties can be replaced in their original positions." *Turner v. Domestic Investment and Loan Corp.*, 119 R.I. 29, 33, 375 A.2d 956 (1977).

These restrictions on the applicability of rescission are fatal to BTA's claim for innocent misrepresentation. BTA loaned $2 million to Fleet; Fleet in turn loaned the money to Liuzzo. Liuzzo, of course, has defaulted on his payments. If the contract between BTA and Fleet was allowed to be rescinded now, Fleet would be forced to repay BTA its participation share, and Fleet would then only have a cause of action for that $2 million against Liuzzo. In short, there is no way that Fleet can be "restored to the status it occupied prior to the contract" with BTA. As a result, rescission is an inappropriate remedy here and BTA's claim for rescission for innocent misrepresentation (or for any other reason) must fail.

#### D. Justifiable reliance

■ As a matter of law, all three claims, for innocent, negligent and intentional misrepresentation, cannot survive for another, shared reason. Though the three causes of action differ in some respects, one element necessary to establish a prima facie case common to all three is that the plaintiff must have *justifiably relied* on the representation, mistaken or deceitful, made by the defendant. *Halpert v. Rosenthal*, 107 R.I. 406, 413, 267 A.2d 730 (1970) (innocent misrepresentation), *Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85, 91 (D.R.I.1968) (negligent misrepresentation), *LaFazia v. Howe*, 575 A.2d 182 (R.I.1990) (intentional misrepresentation).

All three misrepresentation claims are controlled by a recent case from the Rhode Island Supreme Court, *LaFazia v. Howe*, *id.* In *LaFazia*, plaintiffs/sellers sued defendants/buyers for failing to make the final payment on a note for the purchase of a delicatessen. The buyers asserted a counterclaim, alleging that they had been induced to buy the operation by false and material misrepresentations made to them by the sellers concerning the delicatessen's past revenues. Before the sale, the buyers had examined the tax returns of the business and expressed concern over the low profits, but they had been reassured by the sellers' verbal representations that in reality the business was much more profitable than indicated by the records. Consequently, the buyers agreed to the sale and signed a contract with the following disclaimers:

9. The Buyers rely on their own judgment as to the past, present or prospective volume of business or profits of the business of the Seller and does [sic] not rely on any representations of the Seller with respect to the same.

10. No representations or warranties have been made by the Seller, or anyone on its behalf, to the Buyers as to the condition of the assets which are the subject of this sale, and it is understood and agreed that said assets are sold 'as is' at the time of sale.

575 A.2d at 183. A standard merger clause was included as well. Distinguishing these clauses from other "general, nonspecific" disclaimer clauses, the Court upheld summary judgment for the sellers:

It is fundamental to actions predicated on the theory of deceit that the party claiming deceit present evidence that shows that he or she was induced to act because of his or her reliance upon the alleged false representations. *East Providence Loan Co. v. Ernest*, 103 R.I. 259, 263, 236 A.2d 639, 649 (1968).

... [Here] the merger and disclaimer clauses preclude defendants from asserting that plaintiffs made material misrepresentations regarding the profitability of the business. The clauses prevent defendants from successfully claiming reliance on prior representations.

575 A.2d at 185.

In the present case, BTA alleges that Fleet made the material misrepresentations described previously concerning the Medicaid investigation and the audit. In

addition, BTA claims Fleet further misrepresented Liuzzo's creditworthiness by: 1) stating in the participation proposal and other written documents that Liuzzo was in compliance with all federal and state laws and regulations; 2) failing to respond honestly when BTA's credit officer remarked to Fleet's officers that they had found "an honest nursing home operator," [Palmer transcript, page 94]; and 3) providing BTA with a copy of the revolving credit agreement containing Liuzzo's own representations and warranties.

Following the negotiation and planning period (during which BTA claims these misrepresentations were made), BTA and Fleet both signed the Participation Agreement, which contained the following clause:

> 10. *Participant Representations and Warranties.* The Participant represents and warrants to the Bank that:
>
> (a) its execution and delivery of this Agreement has been duly authorized; the Participant has full power and authority to purchase the Participation; and the Participant's decision to purchase the Participation was based solely upon its own independent evaluation of the Loan, the Borrower's creditworthiness and the value and lien status of the Collateral, and all other matters relating thereto.

Participation Agreement, page 6. The impact of this clause is the same as *LaFazia*'s specific disclaimer clause: it renders legally irrelevant all misrepresentations, innocently, negligently, or intentionally, made by Fleet to BTA before the Participation Agreement was signed. As in *LaFazia*, the Fleet/BTA disclaimer concerns the very matter about which BTA now claims it was defrauded, i.e., Liuzzo's creditworthiness. Having asserted in unambiguous contract language that it based its decision to participate in the loan "solely upon its own independent evaluation," BTA cannot now claim that it was relying upon Fleet's representations. Furthermore, the Court holds that if BTA did indeed rely on Fleet's representations, and not on its own appraisal, then that reliance was not justifiable in light of the contract between the parties.

Because the key element, justifiable reliance, cannot be established for any of BTA's three misrepresentation claims, these counts in BTA's complaint fail to pass muster. The Court, therefore, grants Fleet's motion for summary judgment on BTA's entire complaint, and denies BTA's motion for partial summary judgment on its fourth count.

## II. *Fleet's counterclaims*

Fleet has brought two counterclaims against BTA. The first is a breach of contract claim, which asserts that BTA violated Section 13.2 of the Participation Agreement, the "cooperation clause." The second claim is that BTA intentionally interfered with the contractual relationship between Fleet and Liuzzo by initiating litigation against Fleet in connection with the loan. BTA has moved for summary judgment on both counterclaims.

### A. The breach of contract claim

■ Under the terms of the Participation Agreement, Fleet was obligated to notify BTA "as soon as [is] reasonably practical" after it acquired "Actual Knowledge of the occurrence of a material Event of Default or Default Condition." Section 13.1. "Default Condition" is defined in § 9.1(b) as an "event or condition which upon notice or passage of time or both could become an Event of Default." Section 13.2 provides that after notice is given as required by § 13.1, Fleet may pursue a course of action that it, "the Participant and the Other Participants shall agree upon." The paragraph continues:

> In the event that the Bank [Fleet], the Participant, and the Other Participants do not agree on the foregoing within five (5) days after Participant's receipt of notice of the occurrence of such an Event of Default, Default Condition, or proposed action or omission, the Bank shall take such action or actions, assert such rights, exercise such remedies and/or waive such Event(s) of Default or Default Condition(s) or refrain from taking such actions with respect thereto as the

holders of a majority of the percentage interests in the Loan (including the Bank) shall deem appropriate in the circumstances, *and Participant will cooperate fully with Bank in connection therewith.*

Participation Agreement, page 7 (emphasis added).

Fleet asserts that it notified BTA of the Medicaid investigation on December 6, 1988. A series of meetings were then scheduled for the participant banks to discuss with Fleet the course of action to pursue. According to Fleet, BTA refused to participate in some of these meetings and instead, on February 6, 1989, demanded that the Participation Agreement be rescinded and that Fleet buy back BTA's portion of the loan. Moreover, BTA initiated an independent investigation with New York State authorities into Liuzzo's business operations, and, ultimately, filed this action against Fleet on April 7, 1989. BTA's refusal to attend meetings with the other participant banks, its investigation of Liuzzo, and its suit against Fleet, all, according to Fleet, represent breaches of the cooperation clause.

BTA responds with a number of arguments. First, BTA claims that the notice required under § 13.1 was not provided until February 21, 1989, when Fleet sent Liuzzo the first notice of default. Because BTA had already requested that Fleet rescind the loan by that date, BTA argues that its actions are not governed by the cooperation clause, which covers only actions taken five days after § 13.1 notification.

Second, BTA argues that Fleet suffered no injury as a result of BTA's failure to cooperate and, consequently, cannot sue for damages. BTA's third argument is that if the act of filing suit against Fleet is in itself a violation of the cooperation clause, then the clause works as a covenant or contract not to sue, and is "disfavored by the law."

As the Court has already indicated, BTA had no right to seek rescission of the Participation Agreement. BTA, by adopting a rescission stance, by necessity took an adversary position to Fleet and thus failed to cooperate with Fleet in its attempt to become disentangled with Liuzzo. Therefore, without engaging in a lengthy review of BTA's arguments and Fleet's counterarguments, it is clear that the Court *cannot* hold as a matter of law that BTA did not breach the Participation Agreement by its refusal to participate in the course of action agreed upon by Fleet and the other participants vis a vis Liuzzo. Consequently, the Court must deny BTA's motion for summary judgment on Fleet's first counterclaim.

### B. The claim for intentional interference with contractual relationship

Fleet claims that BTA's independent inquiry into Liuzzo's operations and the initiation of litigation against Fleet in connection with the Liuzzo loan represent a wrongful interference with the contractual relationship between Fleet and Liuzzo. Through these actions, Fleet states in its answer, "BTA has jeopardized the likelihood that the borrower will perform in accordance with the terms of the Loan."

The necessary elements of the tort of interference with a contractual relationship are as follows: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom." *Smith Devel. Corp. v. Bilow Enterprises*, 112 R.I. 203, 211, 308 A.2d 477 (1973).

Although Fleet can readily show that a contract existed and that BTA knew of it, Fleet's evidence falls short of establishing the third and fourth prongs of the prima facie case. While BTA's decision to, as Fleet phrases it, "take sides with Liuzzo" may have fanned the flames of the Fleet/Liuzzo dispute, this effect was indirect at best. There is no evidence that BTA intended its actions to further disrupt the relationship between Fleet and Liuzzo; instead, it appears that BTA was simply trying to extricate itself from a deal that was going sour. As for Fleet's ability to show any damages resulting from BTA's actions, these are entirely speculative.

Fleet's damages (whatever they turn out to be) were caused by Liuzzo's default. There is no evidence that BTA *caused* Liuzzo's default. In fact, the indications are that the Fleet/Liuzzo loan relationship was rapidly deteriorating at the time BTA took the actions complained of by Fleet.

Because of the failure of evidence necessary to establish the prima facie case for intentional interference with contractual relationship, the Court must grant BTA's motion for summary judgment on Fleet's second counterclaim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### Conclusion

The Court has granted summary judgment for Fleet on all four claims of BTA's complaint. Therefore, BTA's motion for summary judgment on its own fourth claim has been denied.

Fleet's counterclaim for breach of contract survives, as the Court has denied BTA's motion for summary judgment on this claim. However, the Court has granted BTA's motion for summary judgment on Fleet's second counterclaim for tortious interference with contractual relations.

Because of Fed.R.Civ.P. 54(b), no judgments shall enter until the remaining issues in this lawsuit are resolved.

*It is so ordered.*