In re Cecelia **FRUSHER**, Debtor.

Cecelia **FRUSHER**, Plaintiff,

v.

**BASKIN–ROBBINS ICE CREAM CO.,**
**Baskin–Robbins, Inc., Defendants.**

Bankruptcy No. 91–10120.
Adv. No. 91–1108.

United States Bankruptcy Court,
D. Rhode Island.

Oct. 27, 1992.

William Y. Chaika, Chaika & Chaika, Cranston, R.I., for debtor, plaintiff.

Mark Freel, Matthew Oliverio, Edwards & Angell, Providence, R.I., for defendants.

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard over the course of six trial days in June, 1992, on the Plaintiff/Debtor's five count Complaint alleging: (1) negligent misrepresentation; (2) breach of contract; (3) intentional misrepresentation; (4) fraud and deceit; and (5) violation of the Rhode Island Deceptive Trade Practices Act. R.I.Gen.Laws § 6–13.1–1 *et seq.* Baskin–Robbins has counterclaimed for franchise fee arrearages in the amount of $20,476.

At the close of the Plaintiff–Frusher's case, Defendants Baskin–Robbins Ice Cream Co. and Baskin–Robbins, Inc. moved for dismissal of all counts except the breach of contract claim. At the same time, Frusher waived Count V, Deceptive Trade Practices. We denied dismissal as to Count I, negligent misrepresentation, and dismissed in part Counts III and IV.[1] We also rejected Frusher's offer of proof of medical testimony regarding alleged emotional harm, in the absence of proof of physical manifestation of such injury. *See Reilly v. United States*, 547 A.2d 894, 896 (R.I.1988), *answering certified question*, 665 F.Supp. 976, 987 (D.R.I.1987), *aff'd in part, remanded in part*, 863 F.2d 149 (1st Cir.1988).

The parties have stipulated to the following, which we adopt herein as our findings of fact and conclusions of law.

From 1980 through September 1990, Cecelia Frusher operated a Baskin–Robbins store in Cranston, Rhode Island. About

---

1. We granted Baskin–Robbins' motion to dismiss as to both intentional and negligent misrepresentation to induce the Plaintiff to enter into the new franchise agreement discussed *infra*, but denied the motion with respect to alleged subsequent conduct by Baskin–Robbins.

midway through that period, in March, 1985, Frusher attended a regional franchisee meeting in Danbury, Connecticut. Present on behalf of the franchisor, among others, were Ronald Marley, then President of Baskin–Robbins, and James Earnhardt, a then-vice president of the company. At the meeting, Mr. Marley introduced a new concept of franchise agreement which was designed in part to allow franchisees to sell a wider range of non-Baskin–Robbins products such as Coca–Cola, as well as certain new products, especially frozen yogurt which was coming into popular demand and being sold by the competition.

As an incentive for franchisees to switch over promptly from their existing contracts which limited them to the sale of traditional ice cream products, Baskin–Robbins offered for a limited time to waive fees and royalties for the first six months of any new agreement.[2]

After attending the March 1985 meeting, Frusher, apparently persuaded by Baskin–Robbins' promotion of its new franchise agreement, decided to go with the new offering. After a short period of operation under an interim arrangement, Frusher entered into one of Baskin–Robbins' "new" franchise agreements, which was to run through January 31, 1991. The parties embarked in business under the new agreement, which contained certain renewal options that were conditioned expressly upon Frusher meeting certain criteria, including remodeling and refurbishing, and "better" (than her previous) compliance with Baskin–Robbins operational standards.

Several years thereafter, and in response to repeated requests by Frusher for frozen yogurt dispensing equipment and product, particularly by a letter dated November 6, 1989, Baskin–Robbins formally turned down her request. As reasons, Baskin–

Robbins informed Frusher that she had failed to implement required changes, including remodeling, refurbishing, and operational procedures as previously discussed, as well as her refusal to purchase and install certain dispensing/display equipment.

In September, 1990, after a prolonged period of continuing losses, and ongoing but unresolved disputes with the franchisor, Frusher closed the store, at that time owing Baskin–Robbins overdue rental and unpaid product charges. On January 17, 1991, Frusher filed for bankruptcy under Chapter 7. On March 20, 1991, Frusher converted her case to one under Chapter 11 wherein the underpinning is the successful financial outcome of the within adversary proceeding against her former franchisor.

## DISCUSSION

### 1. Negligent Misrepresentation

■ The tort of negligent misrepresentation has been recognized by the Rhode Island Supreme Court only in passing, and even then has not been squarely addressed. *See Ostalkiewicz v. Guardian Alarm,* 520 A.2d 563, 569 (R.I.1987) ("assuming without deciding that a separate or distinct action might be brought for negligent misrepresentation...."); *Banco Totta e Acores v. Fleet Nat'l Bank,* 768 F.Supp. 943, 946–47 (D.R.I.1991). In a federal case controlled by Rhode Island law, the District Court has held that an action for negligent misrepresentation could be maintained against an accountant for negligent preparation of financial statements. *Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85 (D.R.I. 1968). In the course of this analysis, Judge Pettine cited § 552(1) of the Restatement (Second) of Torts.[3] *Rusch Factors,* 284 F.Supp. at 91–92.

**2.** We recognize and agree with Frusher's contention that the new franchise agreement was intended to benefit Baskin–Robbins. We cannot accept, however, her additional submission that the new agreement was introduced with the disadvantage of the franchisee in mind.

**3.** Section 552 currently provides:
One who, in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
Restatement (Second) of Torts § 552 (1977).

Liability for this type of conduct arises only where false information, negligently obtained or communicated by the alleged tortfeasor, causes pecuniary loss to one who reasonably relied on that information. Looking at the evidence before us, we cannot find that *false* information was given by Baskin–Robbins' agents or employees to Mrs. Frusher. Clearly there were representations made by then-president Marley, regarding anticipated sales increases for those signing up with the new franchise agreement, and the attendant expansion of saleable products. But given the nature of those representations (sales promotion), and the uncertain state of the industry at that point time, those representations have not been shown to be false when made, nor could the certainty of such projections have been reasonably relied upon by Frusher. Statements of opinion cannot form the basis for a misrepresentation claim, *see Grassi v. Gomberg*, 81 R.I. 302, 102 A.2d 523 (1954), and Frusher's claim for negligent misrepresentation must, therefore, be denied.

## 2. Intentional Misrepresentation

Unlike as with negligent misrepresentation, the tort of intentional misrepresentation is well established in Rhode Island law, where the plaintiff must prove:

1. That defendant made a false representation;
2. That defendant intended thereby to deceive the plaintiff;
3. That defendant intended that plaintiff rely on the representation;
4. That plaintiff did in fact rely on the misrepresentation; and,
5. That plaintiff was injured as a result.

*Banco Totta*, 768 F.Supp. at 947 (citing *Cliftex Clothing Co., Inc. v. DiSanto*, 88 R.I. 338, 148 A.2d 273 (1959)). Having already determined that there is no evidence of intentional misrepresentation prior to and including the Danbury meeting (in ruling on Baskin–Robbins' motion to dismiss), we must now consider whether intentional misrepresentations were made *after* that time. Although the record is replete with examples of how these parties dis-

agree over how to run a franchise store, there is no evidence to support the allegation of intentional misrepresentation, and the Plaintiff's claim under this count must also be denied. In *Halpert v. Rosenthal*, 107 R.I. 406, 267 A.2d 730 (1970), the Rhode Island Supreme Court held that a party who has been fraudulently induced to enter into a contract has a choice of two remedies: the contract may be affirmed and tort damages sought; or the agreement may be rescinded and recovery had for amounts paid under the rescinded contract. *Id.* at 733; *LaFazia v. Howe*, 575 A.2d 182, 185 (R.I.1990). Here, because the contract has expired by its terms, the first option under *Halpert* is not available to Frusher. The second option allows for recovery for so called "innocent" misrepresentation. *Halpert*, 267 A.2d at 735. This too must fail, for lack of evidence of misrepresentation of *any kind*.

## 3. Fraud and Deceit

Frusher's claim for fraud and deceit requires even more egregious conduct and stronger proof than her two misrepresentation claims, where she has fallen short. *See Halpert*, 267 A.2d at 733–36. Accordingly, this must also be denied.

## 4. Breach of Contract

The franchise agreement signed by the parties unambiguously establishes the rights and responsibilities of each, including Frusher's (conditional) entitlement to sell new products such as frozen yogurt. Despite what she characterizes as unreasonable behavior on the part of Mike Sleeper, Baskin–Robbins' district manager, and Cynthia Harris, its operations manager, Frusher has produced no persuasive evidence of any action or conduct on the part of Baskin–Robbins' employees or agents which were contrary to the terms of those agreements, or that they "were out to get her." The Debtor's allegations and suggestions that she was the target of a corporate vendetta, or that Baskin–Robbins wanted to run this as a company store, remain unproved. The most that can be said in this regard is that Cecelia Frusher did not like Baskin & Robbins or its em-

ployees, and that by the time the relationship was ended, the feeling was probably mutual. Based upon the entire record, we conclude that Frusher's failure to shape up and to live up to the conditions in the new agreement gave Baskin–Robbins reasonable cause to refuse her the new product line. In addition, Baskin–Robbins has introduced credible live and deposition testimony indicating numerous, although from Frusher's standpoint—picayune, violations of the franchise agreement. Her allegation of breach of contract against Baskin–Robbins is not supported by the evidence, while her own shortcomings as a franchisee are pretty well established.[4]

On the separate issue of damages, Frusher's claims must also be denied for shortage of proof. Both under her contract and tort theories of recovery, Frusher failed to establish a quantifiable basis for the award of any direct, expectancy, or compensatory damages. Testimony elicited from Mrs. Frusher regarding the decline of her business and the dissipation of her personal assets is too remote and speculative to be causally related to Baskin–Robbins' conduct. Her accountants' projections of lost future earnings require assumptions as to the viability of the business which are much too speculative for the standard of specificity we are required to apply. *See Kelley v. Medeiros (In re Kelley)*, 131 B.R. 532 (Bankr.D.R.I.1991).

It is generally true that punitive damages are not recoverable where compensatory damages are unproven. Here, even if the Plaintiff had established her right to recover compensatory damages, the Defendants' conduct clearly would not rise to the level of "criminality" or "recklessness" required in this jurisdiction to support an award of punitive damages. *See, e.g., Regan v. Cherry Corp.*, 706 F.Supp. 145, 153 (D.R.I.1989) (Rhode Island law criminality standard for punitive damages requires "intentional conduct that is malicious"); *T & S Serv. Assocs., Inc. v.*

*Crenson*, 505 F.Supp. 938, 945–46 (D.R.I. 1981), *vacated on other grounds*, 666 F.2d 722, 728 (1st Cir.1981) (defendant must have acted with malice, wantonness, or willfulness of such an extreme nature as to amount to criminality); *Morin v. Aetna Casualty & Sur. Co.*, 478 A.2d 964, 967 (R.I.1984) (same). Notwithstanding Frusher's protestations to the contrary, we have no basis to make such a finding, on the facts before us.

Accordingly, based on the foregoing discussion, findings and conclusions, counts I through IV of Plaintiff's Complaint are DENIED. Finally, since Baskin–Robbins introduced no evidence in support of its contested Counterclaim for $20,476 in unpaid rent and product purchases, its Counterclaim is DENIED.

Enter Judgment consistent with this opinion.

---

4. Running throughout this business relationship is the "theme" that Cecelia Frusher was paying the price of independence, and that she could not or would not fit the mold required of national franchisees. The fact that Ms. Frusher was not willing to become a Baskin–Robbins' clone is, at the same time admirable, and yet fatal to her case.