October 4, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2342

JOHN P. MURRAY, ET AL.,

Plaintiffs, Appellants,

v.

ROSS-DOVE COMPANY, INC. AND

DOVETECH, INC.,

Defendants, Appellees.

ERRATA SHEET

The opinion of this Court issued on September 27, 1993, is
amended as follows:

On page 12, last line of footnote 5, replace "continual"
with "continued".

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2342

JOHN P. MURRAY, ET AL.,

Plaintiffs, Appellants,

v.

ROSS-DOVE COMPANY, INC. AND

DOVETECH, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Torruella, Circuit Judge,

Feinberg,* Senior Circuit Judge,

and Boudin, Circuit Judge.

Robert M. Duffy with whom Michael P. DeFanti and Hinckley, Allen

& Snyder were on brief for appellants.

Michael B. Waitzkin with whom Eric L. Lewis, Rima Sirota,

Nussbaum & Wald, Marc C. Hadden and Gidley, Sarli & Marusak were on

brief for appellees.

September 27, 1993

*Of the Second Circuit, sitting by designation.

BOUDIN, Circuit Judge. This is an appeal from a

decision of the district court withdrawing from the jury a

commercial dispute at the end of the plaintiffs' case.

Although we think that the plaintiffs' evidence failed to

show fraud and we treat an aiding and abetting claim as

abandoned, the evidence of negligence and injury was in our

view just adequate to foreclose a directed verdict.

Accordingly, we affirm the ruling as to the fraud claim but

vacate the judgment as to the negligence claims and remand

for further proceedings, strongly encouraging the parties to

explore settlement of this case.

I. BACKGROUND

Plaintiffs are three individuals, Franklin D. Crawford,

John P. Murray, Jr. and J. Michael Murray, known collectively

as "the Crawford Group," and an associated investment entity,

Bevmar Acquisition Corp. Defendants are Ross-Dove Company,

Inc., a commercial auction firm, and Dovetech, a division of

Ross-Dove (which may well not be a suable entity). The

dispute arises out of an appraisal done by Ross-Dove of

certain assets of Bevmar, Inc. ("Bevmar"), a California

corporation formerly engaged in the manufacture and sale of

electronic circuitry panels.

In 1989, one Robert H. Marik, an acquaintance of

Crawford, organized Bevmar Acquisition Corp. as part of an

effort to solicit investments in Bevmar. In aid of that

-2-

effort, an investment banker working with Marik engaged

Dovetech to appraise certain of Bevmar's assets. Dovetech's

appraisal was conducted by Bruce Schneider, with help from

other employees, and was completed in June 1989. That

appraisal valued Bevmar's machinery, equipment, molds and

dies at three different values, ranging from over $2 million

total to over $6 million depending on the circumstances of

sale. The appraisal said that the appraised value of molds

and dies should not decline for at least three years.

In September 1989, Marik invited Crawford to invest in

Bevmar, through the Bevmar Acquisition Corp., and Marik made

the Dovetech appraisal of Bevmar's assets available to

Crawford. Crawford contacted Schneider to explain his

interest in Bevmar and to determine the status of the

Dovetech appraisal. Schneider assured Crawford that the

appraisal was still valid. In October 1989 Crawford,

together with the two Murrays, paid $3 million for a stake in

Bevmar comprising a loan to Bevmar to be repaid at 20 percent

annual interest, a 40 percent equity interest in the company,

and a bonus depending on the fortunes of the company.

To secure the loan, Bevmar gave the Crawford group a

security interest in all of its machinery, equipment, molds

and dies. There were some discrepancies between items listed

in the Dovetech appraisal and items listed in the recorded

security filings, but the latter lists were delayed and the

-3-

discrepancies not immediately noticed. What did become

rapidly apparent was that Bevmar was in deep trouble.

Crawford invested a further $500,000 but in March 1990 a

chapter 7 petition was filed and Bevmar entered bankruptcy.

When its assets were liquidated, the amount realized on the

machinery, equipment, molds and dies was about $453,000.

The plaintiffs then commenced this suit in the district

court charging Ross-Dove and Dovetech with negligence,

negligent misrepresentation, fraud, and aiding and abetting

the torts of others.1 Actual damages in the amount of $4.5

million were sought, as well as punitive or exemplary

damages. The gist of the complaint was that Dovetech had

carelessly or dishonestly overestimated the value of the

assets it had appraised in June 1989 and that the Crawford

group had relied to its detriment on that appraisal in

investing in Bevmar.

After discovery, a four-day jury trial occurred in

September 1992. Plaintiffs offered testimony from a number

of witnesses, either in person or by deposition, including

the three Crawford group members, Schneider, two Bevmar

employees, an employee of the company that purchased the

molds and dies after Bevmar's bankruptcy, and an appraiser

who had appraised Bevmar machinery and equipment and given a

1The last of these claims is not discussed in the
plaintiffs' brief on appeal, there is scant evidence to
support such a claim, and we treat it as abandoned.

-4-

general opinion about the value of its molds and dies in

March 1989. Surprisingly, plaintiffs did not provide an

expert witness to testify as to the inadequacy or

incompetence of Dovetech's appraisal.2

At the close of plaintiffs' case, defendants sought

judgment as a matter of law under Fed. R. Civ. P. 50(a)(1),

the current name of the traditional relief afforded by a

directed verdict. On October 1, 1992, the district court

delivered a detailed oral opinion concluding that plaintiffs

had failed to show that the appraisal was inaccurate or that

defendants were at fault. Alternatively, the court found

failures of proof as to justifiable reliance on the appraisal

and as to causation of injury. Although we regard this case

as a close call, on balance we think that plaintiffs did at

the completion of their opening case have enough evidence to

reach a jury on a negligence theory.

II. ANALYSIS

On a Rule 50(a) motion, appellate review is plenary.

American Private Line Serv., Inc. v. Eastern Microwave, Inc.,

980 F.2d 33, 35 (1st Cir. 1992). The evidence and inferences

from it are considered in the light most favorable to the

2Plaintiffs belatedly attempted to add an expert witness
but this was disallowed because the witness was not timely
listed as required by pretrial orders. Plaintiffs complain
but we see no error in this ruling. The district court did
allow plaintiff to make use of deposition testimony of Steve
Piletz, an expert appraiser who had appraised certain of the
assets in March 1989.

-5-

party opposing the directed verdict, here, the plaintiffs.

Raymond Steel, Inc. v. Puerto Rican American Ins. Co., 954

F.2d 19, 22 (1st Cir. 1992). A directed verdict is proper at

the close of plaintiffs' case only when the plaintiffs'

evidence, viewed in this light, would not permit a reasonable

jury to find in favor of the plaintiffs on any permissible

claim or theory.

A reviewing court must thus ask whether the plaintiffs

have offered enough evidence to permit findings in

plaintiffs' favor on each of the elements necessary to prove

at least one cause of action. Here, the parties have assumed

that Rhode Island law defines the causes of action--why is

not clear--and we accept this premise. See In re Newport

Plaza Associates, L.P., 985 F.2d 640, 644 (1st Cir. 1993).

It also appears to be common ground that, under Rhode Island

law, a cause of action for negligence or negligent

misrepresentation exists if the Dovetech appraisal was

inaccurate, the inaccuracy stemmed from negligence, reliance

on the appraisal was justified, and the reliance proximately

-6-

resulted in injury.3 With this yardstick, we turn to the

evidence.

3Because plaintiffs' claims of negligence and negligent
misrepresentation both allege negligent supply of false
information, we will consider them as the same claim. See

Ralston Dry-Wall Co., Inc. v. United States Gypsum Co., 740

F. Supp. 926, 932 (D.R.I. 1990), aff'd, 926 F.2d 99 (1st Cir.

1991). The Rhode Island Supreme Court has not yet directly
addressed a cause of action for negligent misrepresentation,
Ostalkiewicz v. Guardian Alarm, 520 A.2d 563, 569 (R.I.

1987), but federal courts applying Rhode Island law have held
that negligent misrepresentation is actionable. E.g., Banco

Totta e Acores v. Fleet Nat'l Bank, 768 F. Supp. 943, 946-47

(D.R.I. 1991); Ralston Dry-Wall Company, Inc., 740 F. Supp.

at 932.

-7-

A. Inaccuracy and Fault

The first two elements, inaccuracy in the appraisal and

negligence in its preparation, are closely related and need

to be considered together. In the abstract, an appraisal

could be inaccurate without fault, or it could be carelessly

prepared but correct in its conclusion. But in this case, as

in many, the issues overlap because if inaccuracy is shown,

the magnitude of the inaccuracy may be some evidence of

negligence. How strong the inference would be depends, as

usual, on the facts.

Here, plaintiffs' best case for error in the appraisal

and for negligence, stripped to its essentials, can be easily

summarized. First and most important, plaintiffs offered

evidence of a gross disparity between the appraisals of value

assigned by Dovetech to the Bevmar molds and dies in June

1989 and the value realized for the Bevmar molds and dies

about a year later. In the Dovetech appraisal, the molds and

dies were evaluated as follows:

AUCTION: $16,000 x 96 = $1,536,000
ORDERLY: $21,000 x 96 = $2,016,000
IN PLACE: $42,000 x 96 = $4,032,000

According to the appraisal, "auction" meant disposition "as

is" at an auction sale completed in a 30-40 day time frame;

"orderly" meant orderly liquidation over a maximum of six

months; and "in place" meant as part of an ongoing

enterprise.

-8-

When the 96 molds and dies were auctioned as a lot in

July 1990, the winning bid was $40,000 for the whole lot and

was made by Elcor Corporation, which had sold 96 molds and

dies to Bevmar in 1986. When its representative arrived to

collect the molds and dies, he found some to be in poor

condition and others to be incomplete, missing or claimed by

another company. Thus the plaintiffs' starting point was

their proof (subject to reservations yet to be discussed)

that molds and dies appraised at a minimum price of $1.5

million in 1989 had sold for less than 3 percent of the this

figure a year later.

There was far less of a disparity as to the machinery

and equipment; the minimum estimate provided by Dovetech was

around $676,000 and the auctions of these items returned

about $413,000. The district court, after evaluating the gap

between the appraisal and the realized price for the

machinery and equipment found no proof of material inaccuracy

at all. But the molds and dies represented about two-thirds

of the total value attributed by Dovetech to machinery,

equipment, molds and dies. A serious error in their

appraisal could by itself easily be an adequate basis for

finding the appraisal to be materially in error.

The disparity in the price predicted and the price

realized for the molds and dies is hardly conclusive. The

auction might not have been fair, although there is no

-9-

suggestion of that in this record. Or conditions might have

changed so materially that no negligence could be imputed

based on the disparity; in this instance, Crawford testified

briefly that market conditions had if anything improved. But

a very large and unexplained disparity offers a prima facie

case of error in the appraisal and at least some evidence of

negligence.

Whether the huge disparity here would be sufficient

evidence of negligence need not be decided, because there was

further evidence that cast an unfavorable light on the

appraisal. All of the Bevmar molds and dies were located at

Bevmar's California plant or at about eight other locations

where they were held by Bevmar subcontractors to make

products for Bevmar. Schneider testified that he visited

each of the nine locations in making his appraisal and then

consulted by telephone with subcontractors and others as to

what they would pay if the molds and dies were sold.

But Elcor's representative testified that after Elcor

won the bid a year later, he visited each of the nine

locations and found many of the items in poor condition, in

some cases even unusable. And a Bevmar employee testified

that Schneider had visited only three of the subcontractors

when doing his appraisal, had not even examined all the molds

and dies at these three stops, and had been told that some

items were missing. There was testimony that the molds and

-10-

dies were different and in different condition. Against this

background, a jury could have regarded Schneider's assignment

of a uniform figure to each of the 96 molds and dies (e.g.,

$16,000 apiece if auctioned) as highly suspicious and as

further evidence that Schneider had done a sloppy appraisal.

The deposition testimony of Schneider could also have

reinforced a jury's judgment that the appraisal was

negligent. His expert credentials were fairly thin but, far

worse, portions of his deposition transcript read to the jury

were littered with the entry "no response" when he was

pressed on the puzzling uniformity of figures and related

matters. There was no real evidence of fraud or of aiding

and abetting fraud, and we do not fault the trial court in

withdrawing this issue from the jury. Yet at least some of

the evidence that plaintiffs associate with fraud could have

further undermined the jury's confidence in Schneider's skill

and care.4

We think that the evidence recited would permit a

reasonable jury to conclude that Schneider's appraisal of the

molds and dies was erroneous in the sense that it was not a

4Schneider relied in appraising the machinery and
equipment located on the East Coast on photographs sent to
him by a Dovetech employee based in Massachusetts. He
apparently knew that Marik was seeking a high appraisal
figure. And he was associated, although the evidence was
somewhat confused, with a possible proposal in September 1989
for Ross-Dove itself to offer $500,000 to Bevmar for all of
the items in question, the same month in which he assured
Crawford that the June 1989 appraisal was still valid.

-11-

responsible estimate of value and, further, to conclude that

its preparation was negligent. A jury might not so find, and

a strong defense case might make such findings less likely or

even impossible. Still, limiting ourselves to the evidence

as it stood at the close of plaintiffs' case, and resolving

inferences and issue of credibility in favor of the

plaintiffs, we think that a jury that found error and

negligence in the appraisal would not be irrational.

We turn now to the district court's discussion of the

molds and dies, a subject that the court fairly described as

difficult and to which it gave careful attention. The court

gave three reasons for disregarding the discrepancy between

appraisal and realized value. The first was that Schneider's

appraisal was based on the market value of the items as

functioning molds and dies whereas the molds and dies were

(in the district court's words) "apparently sold at auction

as scrap," some being operational and some not. This, said

the court, made a comparison between predicted and realized

price of the items a comparison of apples and oranges.

With respect, we think it might be more accurate to say

that Schneider appraised the molds and dies as apples but

they, or some of them, turned out to be oranges. It is not

clear what knowledge Elcor had of the molds and dies before

the auction. The molds and dies seem to have been advertised

for auction as operational, since pictures of the items they

-12-

could produce were offered. Having sold 96 molds and dies to

Bevmar in 1986, Elcor may have supposed that it already knew

what it was getting. At the same time, Elcor's bid was

certainly very low and may be open to the inference that

Elcor knew that many of the items were scrap or little more.

No doubt, as the district court assumed, it is implicit

in Schneider's estimate of $1.5 million that the molds and

dies would be bought for use, for $1.5 million is obviously

above scrap value.5 But by the same token it is also

implicit in the appraisal that they were capable of such use

and would normally be so employed, absent a major change in

market conditions or in the items themselves. Yet there is

no evidence that market conditions had changed by July 1990

or that the items themselves had unexpectedly deteriorated.

In sum, a jury could condemn Schneider for appraising the

molds and dies as useful when in fact they were largely

scrap.

Second, the district court observed that the buyer of

the molds and dies at the auction got only 20 to 40 of the

molds and dies. The court found these to be "a far cry" from

the 96 that were appraised by Dovetech, the more so because

the court said that the more valuable ones were excluded.

5Piletz, who appraised Bevmar's machinery and equipment
in March 1989, offered an informed guess based on
reproduction value--not an appraisal--that the molds and dies
"might" sell for about $158,000 if sold as scrap and $634,000
if sold for continued use.

-13-

The court evidently believed that the discrepancy in

appraisal and price might have been explained by the fact

that Dovetech was appraising a more extensive and valuable

collection of molds and dies than the subset that was finally

bought by Elcor.

The evidence, however, permitted the jury to find that

Elcor bid on the list of 96 molds and dies without any

knowledge that some were missing or owned by others.6

Further, Crawford's testimony that Elcor had found only 20 to

40 dies is coupled with the statement that many were obsolete

and "[h]ad not been running for years." The jury could well

have thought that, whatever the number owned by Bevmar,

Schneider had no business appraising such items at an average

value apiece of $16,000 (auction) to $42,000 (in place).

Third, the district court held that because the

discrepancy reflected a difference between market value and

scrap value, plaintiffs were required to offer expert

evidence that Schneider had erred in adopting a market value

approach; absent such expert guidance, said the court, the

jury would be left to "speculate" on which approach was

correct. Rhode Island law, even assuming that it controls on

this issue, does not automatically require expert testimony

6The 96 molds and dies were advertised as a lot, and the
Elcor testimony is open to the inference that its
representative was surprised when the post-auction survey
revealed fewer than had been promised.

-14-

to show negligence. Murphy v. United Steelworkers, 507 D.2d

1342, 1345-46 (R.I. 1986). But we agree that, if a choice

were required between competing concepts of value or

competing techniques of appraisal an expert might well be

required.7

Here, however, the evidence permitted the jury to assume

that Schneider's concept of market value was proper but to

conclude that he had negligently assigned excessive market

values to many of the molds and dies. And we conclude that

the jury was capable of appraising the plaintiffs' evidence

of disparity and fault on its own, although expert testimony

would surely have been prudent and helpful. There is nothing

recherche about the reasoning behind the inferences based on

the huge discrepancy between appraisal and proceeds, the

suspiciously uniform estimates, and Schneider's failure (if

the jury so found) to visit each of the sites and inspect the

molds.

B. Reliance and Causation

This brings us to the second element of the negligence

cause of action for which the district court found a failure

7Piletz' deposition suggests that he did believe that a
different method of appraising molds and dies than the
telephone survey used by Schneider was called for. It is
very doubtful that Piletz' alternative approach was explained
adequately to permit the jury to reject Schneider's method.
But plaintiffs' far better case was that Schneider had used a
permissible method but botched the job by failing to do any
adequate inspection or make adequate inquiry.

-15-

of proof, namely, justifiable reliance. A bit of background

is required. The evidence suggested that there were

discrepancies, of several different kinds, between what

Dovetech appraised and what Bevmar actually owned. The

missing molds and dies and uncertainties about ownership of

others have already been mentioned. It also appears that

some of the machinery and equipment in the appraisal may have

belonged to a Rhode Island state entity but was counted in

the appraisal. The district court found a lack of

justifiable reliance because, it said, the plaintiffs were

not entitled to rely on the appraisal to establish that

Bevmar owned the items appraised. To the extent that the

items were not owned by Bevmar, naturally the security

interest in Bevmar's inventory of equipment, machinery, molds

and dies had a reduced value. Therefore, the court

concluded, "the evidence establishes as a matter of law that

there was no justifiable reliance on the appraisal to

establish the expected security interest in these assets."

Plaintiffs concede that the ownership of the items

appraised was not within the scope of the representations in

the appraisal. At most, the appraisal purported to appraise

property at Bevmar's facilities or, in the case of some molds

and dies, property Bevmar claimed to have lent to its

subcontractors. Thus it is true that plaintiffs would have

no case if their cause of action depended on showing that

-16-

they reasonably relied upon the appraisal to establish

Bevmar's title. It seems to us that plaintiffs' cause of

action, specifically the showing of reliance and injury, does

not depend on such a showing.

The problem is confused because plaintiffs in this case

have been somewhat fuzzy in their theory of damages. It is

often attractive for a plaintiff with evidence of wrongdoing

and evidence of loss to throw the evidence to the jury and

hope that the jury will make a causal connection. In this

case plaintiffs had available two different theories, and

there are hints of both in its pleadings and arguments. One

theory is that, but for the misappraisal, plaintiffs would

not have invested at all and would still have their $3.5

million; the other is that their security interest would have

been worth more if the appraisal had been accurate.

Plaintiffs offered their own testimony on the first

theory, namely, that they would not have made the initial

investment if they had known that the assets in question were

worth far less than the appraisal said.8 From this

standpoint, it does not matter whether some of the assets in

question belonged to Rhode Island or to Bevmar

8The testimony on this issue is not crystal clear but it
was adequate for the jury to draw such a conclusion. And
given the importance the Crawford group attached to the
appraisal, evidenced by other facts (e.g., the inquiry to

Schneider and a separate inquiry into Ross-Dove's
reputation), the conclusion is eminently plausible.

-17-

subcontractors. If plaintiffs' testimony is accepted, then

the mistaken appraisal "caused" the loss in the familiar "but

for" sense: but for the mistake, the loss would not have

occurred. (We defer for the moment questions of intervening

cause.) The validity of the security agreement simply does

not matter.

Its validity very much does matter on the second

possible theory of injury, namely, that the misrepresentation

caused loss insofar as it overstated the value of the

security interest, reducing plaintiffs' protection in the

event of bankruptcy. On this theory, any misestimate of

value would indeed be harmless as to those assets that were

misappraised but were not owned by Bevmar. Whether one

speaks of unjustified reliance or lack of causal connection,

plaintiffs' damage claims would be proportionately reduced.

Perhaps any damage recovery on this second theory might be

speculative on this record;9 but we need not decide the

point for there is nothing obviously wrong with the first

theory as a basis for getting to the jury.

Defendants on appeal offer a different argument as to

why Crawford's reliance on the appraisal could not be

justifiable reliance. They argue that the appraisal by its

9Arguably, it would be plaintiffs' responsibility to
show which assets were owned by Bevmar and the extent to
which, as to those assets, the appraisal figure exceeded the
price received at auction. It is unclear whether the record
permits such an allocation.

-18-

terms required the consent of Dovetech before it could be

distributed to third parties other than Marik and Bevmar and

that, at least implicitly, this caveat made reliance on it by

third party investors unreasonable. This view, if accepted,

would undercut both of plaintiffs' possible theories of

injury. It was not adopted by the district court as a basis

for the directed verdict.

There was evidence at trial that Dovetech knew that its

appraisal would be distributed to financing sources such as

plaintiffs. Crawford also testified that he told Schneider

that he (Crawford) and others were going to rely on the

appraisal in making their investment and Schneider reaffirmed

its validity. Piletz testified that appraisers know that

their work will be relied on by third parties. Thus a jury

might find that, even if the appraisal caveat is read as

defendants urge, Dovetech had waived its protection or had

treated the Crawford group as among those for whose benefit

the appraisal had been done.

Finally we turn to the district court's third and last

reason for its directed verdict, which can be described as

accepting an "intervening cause" defense. The district court

found that the lists of assets appraised by Dovetech did not

match the list of assets included in plaintiffs' security

agreement filing; that attorneys acting in some measure for

plaintiffs disbursed plaintiffs' money at the closing before

-19-

certain of plaintiffs' conditions were satisfied; and that

the bankruptcy trustee had challenged the validity of the

plaintiffs' security interest in the pending bankruptcy

proceedings (a challenge that has now apparently been

dropped).

The first and last of these "intervening causes" of

injury are irrelevant so far as the plaintiffs proceed on

their first theory of recovery: as already shown, that theory

does not depend on the validity of the security agreement at

all. The remaining "intervening cause" is the attorneys'

alleged failure to insist at the closing that other promised

third-party investments in Bevmar be committed and that

certain liens against its property be satisfied. The

district court's conclusion may rest on the assumption that,

if the client instructions had been followed, either the

initial $3 million would never have been paid over or, less

likely, the conditions if satisfied would have prevented the

failure of Bevmar.

There was some evidence of the attorneys' supposed

disregard of instructions, but very little about the

significance or consequences of such disregard. Rhode Island

law is not especially friendly to an intervening cause

defense, nor especially precise; and a jury instructed

-20-

according to the state's case law might have considerable

latitude.10 Measured against such language, we do not

think that the evidence presented as to counsel's alleged

mistake at the closing compelled a jury to decide that an

intervening cause was responsible for the plaintiffs' loss.

Whether in presenting their defense defendants could offer

more powerful evidence on this point is another matter.

III. CONCLUSION

To sum up, we agree with the district court that there

was insufficient evidence of fraud to submit that claim to a

jury. But in our view the jury did have sufficient evidence,

judged at the close of the plaintiffs' case, to find material

error in the appraisal and negligence in its preparation.

While plaintiffs may face hurdles on issues of justifiable

reliance, causation, and damages, we think for reasons

explained above that a directed verdict on those grounds

cannot be justified at this stage.

10Thus, "an intervening act will not insulate a
defendant from liability if his negligence was a concurring
proximate cause which had not been rendered remote by reason
of the secondary cause which intervened." Roberts v.

Kettelle, 356 A.2d 207, 215 (R.I. 1976). The first negligent

act will be rendered remote if "a second actor has become
aware of the existence of a potential danger caused by the
negligence of a first actor and the second actor acts
negligently with regard to the dangerous condition, thereby
bringing about an accident with injurious consequences to
others." Walsh v. Israel Couture Post, No. 2274 V.F.W., 542

A.2d 1094, 1096-97 (R.I. 1988). Further, "an intervening act
of negligence will not insulate an original tortfeasor if it
appears that such intervening act is a natural and probable
consequence of the initial tortfeasor's act." Id. at 1097.

-21-

On remand this case should be settled, if humanly

possible. The discrepancy between the appraisal value and

the amount ultimately realized for molds and dies, coupled

with the doubts raised about the appraisal's thoroughness,

ought to make the defense quite uneasy about fault. On the

other hand, the defense may be able in its own case to do a

better job of explaining the discrepancy between the

appraisal and auction price of the 96 molds and dies

appraised by Schneider. How a jury will dispose of the

intervening cause defense is anyone's guess. And even if a

jury makes an award, the award can be appealed.

The parties now have a pretty fair gauge of the

respective strengths and weaknesses of their positions.

Money spent on further litigation is a loss to both sides

regardless of the outcome, since most litigation expenses are

not recoverable. Full reconstruction of the events in this

case for a jury is likely to be especially expensive. We

think counsel would not be serving the interests of their

clients if they failed to make an earnest effort to settle

this case.

The judgment of the district court is affirmed insofar

as it granted judgment as a matter of law on the claims of

fraud and aiding and abetting and is vacated with respect to

the negligence claims. The case is remanded for further

proceedings. No costs.

-22-