303 A.2d 121.

AMERICAN UNDERWRITING CORPORATION *vs.* RHODE ISLAND HOSPITAL TRUST COMPANY.

APRIL 20, 1973.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

416

ROBERTS, C. J. This is an appeal from a judgment entered in the Superior Court for the defendant, the Rhode Island Hospital Trust Company (hereinafter referred to as the bank or Hospital Trust) in a suit on an endorsement of a draft by the plaintiff, American Underwriting Corporation (hereinafter referred to as American Underwriting).

While in this case the facts are not in dispute, the factual situation is highly unusual. A proper understanding of the case requires a detailed explanation of the financial procedures pursuant to which drafts similar to the one under consideration here are issued.

American Underwriting, a finance company, provides relatively low-rate automobile financing. The company makes its loans through a "draft acceptance system." Blank draft forms are placed with 400 to 500 dealers in New England, who are generally insurance agents or automobile clubs. These dealers find the customers for American Underwriting and in return receive a small percentage of the loan as commission. When the dealer has a prospect for an

auto loan, he prepares a financial statement on the borrower and a security agreement covering the automobile that is to be the collateral for the loan. These documents are forwarded to American Underwriting for review. Concurrently, the dealer prepares a draft. On the face of the draft he fills in the amount of the loan, the name of the borrower, and the description of the automobile that is to be the security. On the back of the draft, an endorsement is prepared to be signed by the present owner of the automobile or the present security holder therein. The endorsers, by accepting payment of the draft, agree to furnish to American Underwriting title to the automobile for which the draft is issued, and said title is encumbered by the amount of the loan.

Once the draft is prepared it is given to the borrower, who signs it and then endorses the draft to the owner of the car or owner of a security interest in the car. Such owner, who may be a car dealer, a bank, or a finance company, also endorses the draft and sends it through banking channels to the First National Bank of Boston for acceptance. The First National Bank of Boston notifies American Underwriting of receipt of the draft, and American Underwriting reviews the information gathered by the dealer and determines whether or not to make the loan. If American Underwriting accepts the loan, it issues a check to the First National Bank of Boston for the amount of the draft. This money ultimately reaches the car dealer, bank, or finance company, as the case may be, who thereupon releases the automobile to the borrower.

With this background, we can turn to the draft issued in this case. Brody S. Merritts owned a Mustang that was financed by Hospital Trust. In June, 1968, the loan was in default, and the bank had repossessed the car and stored it with Dunne Ford Sales. Miss Merritts desired to purchase a 1968 Javelin from Stadium Motors, but she needed to retrieve her Mustang for purposes of a trade-in. She

went to the Automobile Club of Rhode Island (hereinafter referred to as AAA) and obtained a draft of American Underwriting in the amount of $2,300, which stated that it was secured by a 1968 Javelin. She took the draft to Thomas F. Flynn, who was collection manager in the installment loan department of the bank, in an effort to redeem her car.

Mr. Flynn told her that he could not accept the draft because it referred to a different car. He asked her where she had obtained the draft, and she told him the AAA gave it to her. Mr. Flynn called the AAA and spoke to Kenneth G. Wood, who had issued the draft. Mr. Flynn explained that the bank held Miss Merritts' Mustang and knew nothing of a Javelin. Mr. Wood told Mr. Flynn that he was aware of the discrepancy, but Miss Merritts was going to trade the Mustang in on the Javelin. In such circumstances, he indicated that it was proper for the bank to process the draft.

Mr. Flynn obtained the bank's endorsement on the draft, and it was forwarded to the First National Bank for acceptance. American Underwriting approved the draft, and Hospital Trust subsequently received $2,300 in proceeds from the draft. The money was applied to Miss Merritts' account to pay off the $2,050.77 loan on the Mustang and a $56 personal loan. Miss Merritts received in cash the balance of $193.16.

The deal then ceased to proceed according to plan. Miss Merritts never bought the Javelin but rather took her Mustang and kept it. Moreover, she failed to make any payments to American Underwriting on her $2,300 loan. American Underwriting contacted Hospital Trust, and at that point it first learned that the bank never had an interest in the Javelin. Apparently, the AAA had never forwarded to American Underwriting the information obtained in the conversation between Mr. Flynn and Mr. Wood. Ameri-

can Underwriting sued Hospital Trust, who in turn brought a third-party action against Miss Merritts. The plaintiff sought recovery from Hospital Trust for its failure to deliver the security interest in the Javelin which plaintiff claims it agreed to do when it endorsed the draft.

The case was tried to a Superior Court justice sitting without a jury. Mr. Donovan, resident manager of American Underwriting, Mr. Flynn from the bank, and Mr. Wood of the AAA testified. These witnesses developed elaborately the relationship of American Underwriting and AAA, and they also described in great detail the circumstances of the loan to Miss Merritts. The evidence disclosed no dispute as to the essential facts of the case. Upon deliberation, the trial justice rendered judgment for defendant, Rhode Island Hospital Trust Company. He found that an agency relationship existed at the time of the transaction between American Underwriting and the AAA. The AAA had authority to gather information, to prepare the drafts, and to transmit that information accurately and properly to American Underwriting. In his opinion, the AAA's transaction with Miss Merritts was for the purpose of enabling her to purchase the Javelin from Stadium Motors. In order to effectuate that transaction, it was necessary for Miss Merritts to liquidate her obligation to Hospital Trust and retrieve her Mustang.

The trial justice further found that the AAA was fully aware of the Hospital Trust's security interest in the Mustang and thus the AAA placed the Hospital Trust's name on the back of the draft in a position as an endorser in order to implement the transaction by paying off the money owed on the Mustang. He further charged American Underwriting with the knowledge of its agent, the AAA. Therefore, when American Underwriting approved the acceptance of the draft, it was reasonable for the Hospital Trust to conclude that the principal was acting in full light of the

information which had been transmitted to its agent. The trial justice ultimately concluded that, upon payment of the draft, Hospital Trust was justified in releasing the Mustang to Miss Merritts and did not violate any obligation owed to American Underwriting.

The plaintiff in its brief made no strong challenge to the trial justice's finding that AAA was its agent. However, such a finding is essentially a factual determination, and whereas plaintiff fails to point out, and our review of the evidence fails to disclose, that the trial justice was clearly wrong, we will not disturb his finding as to the extent of the agency relationship between American Underwriting and the AAA. *Mello* v. *Coy Real Estate Co.*, 103 R. I. 74, 234 A.2d 667 (1967); *Abilheira* v. *Faria*, 102 R. I. 214, 229 A.2d 758 (1967). However, plaintiff makes two contentions which we shall consider at length.

First, it argues that commercial paper is not subject to verbal modification. Secondly, plaintiff contends, even if such modification were permissible, AAA had neither actual nor apparent authority to verbally modify the draft.

The plaintiff asserts that the absence of a parol evidence rule in the chapter of the Uniform Commercial Code dealing with commercial paper implies that parol evidence is strictly forbidden to modify a negotiable instrument. We cannot agree. A review of the comments to the Uniform Commercial Code leads to a contrary conclusion. General Laws 1956 (1969 Reenactment) §6A-3-119, *comment* 1, states: "This Article [Chapter] does not attempt to state general rules as to when an instrument may be varied or affected by parol evidence, except to the extent indicated by the comment to the preceding section."

The preceding section, §6A-3-118, provides certain rules of construction for interpreting negotiable instruments. Comment 1 to that section states: "The purpose of this section is to protect holders and to encourage the free cir-

culation of negotiable paper by stating rules of law which will preclude a resort to parol evidence for any purpose except reformation of the instrument. Except as to such reformation, these rules cannot be varied by any proof that any party intended the contrary." We understand that comment to mean that §6A-3-118 simply establishes certain rules of construction which cannot be altered by parol evidence except in actions for reformation. The section in no way attempts to establish a comprehensive parol evidence rule for commercial paper. If the drafters had intended to have such a rule, they would have explicitly set it out as they did in §6A-2-202, which is a statutory parol evidence rule for sales. These comments indicate that the Uniform Commercial Code states no general parol evidence rule for commercial paper. We turn, then, to our case law to determine under what circumstances parol modification of negotiable instruments is permissible.

We have always adhered to the general rule that in the absence of fraud or mistake, parol evidence is not admissible for the purpose of varying, altering, or contradicting a written agreement. *Supreme Woodworking Co.* v. *Zuckerberg,* 82 R. I. 247, 107 A.2d 287 (1954). However, we have allowed parol evidence to demonstrate that the taking effect of instruments such as promissory notes, contracts of sale, or deeds was intended by the parties to be conditioned upon the performance of some future act or the happening of some subsequent occurrence. *Parrillo* v. *Siravo,* 101 R. I. 524, 225 A.2d 515 (1967); *Lopato* v. *Hayman,* 43 R. I. 271, 111 A. 529 (1920); *Lee* v. *Benjamin,* 40 R. I. 567, 102 A. 713 (1918).

In *Lee* v. *Benjamin, supra,* the vendor of certain real estate brought suit on the purchaser's note, which had been given by him as consideration for the sale. The court held that the defendant could properly testify that he entered into the transaction in question entirely for the accommo-

dation of the plaintiff. The plaintiff had represented to the defendant that he did not want to appear as the owner of the property, and the defendant agreed to deed the property at any time to anyone designated by the plaintiff. The court predicated the admission of the defendant's testimony on G. L. 1909, ch. 200, sec. 22 (section 22 of the Negotiable Instruments Law), which provided that "[a]s between immediate parties, and as regards a remote party other than a holder in due course * * * delivery may be shown to have been conditional, or for a special purpose only, and not for the purpose of transferring the property in the instrument." The court felt the section was sufficiently broad to permit a maker of a note to show the lack of consideration for the note and to show that the parties did not intend that the property in the note was transferred by its delivery.

The successor to sec. 22 of the Negotiable Instruments Law is G. L. 1956 (1969 Reenactment) §6A-3-306. In part, that section provides that one not a holder in due course takes an instrument subject to the defense of delivery for a special purpose. We find nothing in the Uniform Commercial Code which would alter our prior case law which permitted the admission of parol evidence to establish such a defense. Thus, if we find that American Underwriting was not a holder in due course of the draft in question, then it was subject to such a defense.

The holder of an instrument cannot be a holder in due course if he has notice of any defense against the instrument by any person. Section 6A-3-302. Moreover, notice to an agent is notice to his principal as to matters within the actual or apparent scope of the agent's authority. *Spencer Kellog & Sons, Inc.* v. *Providence Churning Co.*, 45 R. I. 180, 121 A. 123 (1923). Hospital Trust had a valid defense to its endorsement. The trial justice found that the endorsement was made to accommodate the transaction in

which American Underwriting would finance Miss Merritts' purchase of a Javelin from Stadium Motors. Hospital Trust never intended to transfer title to the Javelin, and the AAA, as plaintiff's agent, knew this and knew further that the Hospital Trust had no interest in that Javelin. The draft was endorsed by Hospital Trust only for the special purpose of enabling Miss Merritts to obtain her Mustang.

The AAA was an agent of American Underwriting with authority to gather and transmit information and to prepare drafts and obtain endorsements on them. Whereas the AAA was aware of the special purpose for which the bank endorsed the draft, and whereas the AAA became so aware while acting in its capacity as plaintiff's agent, American Underwriting is charged with notice that Hospital Trust endorsed the draft for a special purpose. Consequently, American Underwriting could not be a holder in due course and took the draft subject to the bank's defense. Moreover, that defense could properly be asserted by parol evidence. Thus, we find no error in the trial justice's admission and consideration[1] of the testimony which revealed the purpose for which the Hospital Trust had endorsed the draft.[2]

The plaintiff contends that even if parol evidence is ad-

---

[1]No objection was made at trial to the parol evidence. However, the parol evidence rule is one of substantive law, and evidence violative of the rule, even though admitted without objection, will not be considered. *Philip Carey Mfg. Co.* v. *General Products Co.*, 89 R.I. 136, 151 A.2d 487 (1959); *Allen* v. *Marciano*, 79 R.I. 98, 84 A.2d 425 (1951).

[2]Chief Justice Traynor in *Masterson* v. *Sine*, 68 Cal.2d 222, 436 P.2d 561, 65 Cal.Rptr. 545 (1968), adopted an innovative approach to the parol evidence rule. He asserts that the parol evidence rule arose out of a fear of invention by interested witnesses and also to allow courts to prevent juries from making findings of fact based on their sympathies. Therefore, he concludes that evidence of oral collateral agreements should be excluded only when the fact finder is likely to be misled.

missible in this case, the AAA had no actual authority to modify the draft verbally, and, absent such authority, AAA's alteration of the draft is not binding on American Underwriting. We feel, however, that such a contention misconceives the posture of this case as found by the trial justice. The AAA made no modification of the agreement. The oral testimony, which we have already found to have been properly admitted, points out that there never was any agreement by Hospital Trust to furnish the title to the Javelin. The bank endorsed the draft for the sole purpose of permitting Miss Merritts to obtain her Mustang, which she was then to trade in for the Javelin at Stadium Motors. The AAA had full authority to obtain this information on behalf of American Underwriting. The Hospital Trust forwarded the draft for processing in the reasonable expectation that American Underwriting would have an opportunity to evaluate the situation in light of the information which the bank had given to the AAA. Hospital Trust assumed that if American Underwriting objected to the transaction, American Underwriting would refuse the draft in the acceptance procedure. However, when it received payment for the draft, the bank reasonably concluded that American Underwriting had accepted the transaction as related by the bank to the AAA.

The bank never sought modification of any agreement from the AAA because there could be no agreement until American Underwriting accepted the draft. Rather, the bank merely informed the AAA, which was American Underwriting's agent with authority to gather and transmit information, of an error as to a material fact. American Underwriting was charged with the knowledge of its agent, and when it accepted the draft, it accepted the transaction with notice that the Hospital Trust had no interest in a Javelin and that the bank's endorsement on the draft was for no other purpose than to allow Miss Merritts to obtain

her Mustang. These are the facts as found by the trial justice. They fail to present any issue of an agent's authority to modify an agreement.

The plaintiff's appeal is denied and dismissed, the judgment appealed from is affirmed, and the cause is remanded to Superior Court for further proceedings.

Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Doris did not participate.

*Pucci, Zito & Goldin, Samuel A. Olevson,* for plaintiff.

*Charles J. McGovern,* for defendant.