Bruce V. KELLY and Jeanne
S. Heslop, Plaintiffs,

v.

TILLOTSON–PEARSON, INC., Eastern
Yacht Sales of Rhode Island, Inc., and
the Yacht Headquarters, Inc., Defendants.

Civ. A. No. 92–0384L.

United States District Court,
D. Rhode Island.

Jan. 20, 1994.

Laurel K. Bristow, Partridge, Snow & Hahn, Providence, RI, for plaintiffs.

Justin T. Shay, Cameron & Mittleman, Providence, RI, for defendant Tillotson.

Jerry H. Elmer, Licht & Semonoff, Providence, RI, for defendants Eastern Yacht and Yacht Headquarters.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is now before the Court on motions by defendants Tillotson–Pearson, Inc. ("TPI"), Eastern Yacht Sales of Rhode Island, Inc., and The Yacht Headquarters, Inc.[1] for summary judgment on all counts of the complaint alleging breach of contract claims as well as claims for fraudulent and negligent misrepresentation. For the reasons stated below, the motion of defendant YHQ is granted and the motion of defendant TPI is granted in part and denied in part.

### Factual Background

This suit arises from the purchase by plaintiffs Kelly and Heslop of a powerboat from defendant Tillotson–Pearson, Inc. in May of 1991. In the fall of 1990, plaintiffs contacted Theodore Robie ("Robie"), sales manager of YHQ, a yacht brokerage business located at the Bend Boat Basin in Portsmouth, Rhode Island, to discuss the purchase of a powerboat. Robie and plaintiffs subsequently viewed several boats at the Bend Boat Basin. At this time, plaintiffs noticed but were not shown the 28–foot Rampage powerboat (the "Vessel") which is the subject of this litigation. Plaintiffs later telephoned Robie to ask whether the 28–foot Rampage they had noticed was for sale. Robie inquired of the manufacturer and owner, TPI, and subsequently informed plaintiffs that the Vessel was for sale.

Robie arranged for plaintiffs to view the Vessel in early March of 1991. According to plaintiff Kelly, prior to the initial viewing Robie had informed him in response to a request for a history of the Vessel that the boat had been built as a demonstrator and had been in one boat show. Consistent with this, the engine hours meters indicated approximately three hours of use. After having viewed the Vessel, plaintiffs told Robie they were interested in that powerboat and requested that he inquire about the price.

Plaintiffs, accompanied this time by Robie, viewed the Vessel on a second occasion in March or April of 1991. Plaintiffs allege that they had been informed by Robie prior to this that TPI would fully warrant the hull, engines, gelcoat and mechanical systems for the first season of use. They were also

---

1. Eastern Yacht Sales of Rhode Island, Inc. and The Yacht Headquarters, Inc. are the same legal entity and are hereafter collectively referred to as "YHQ".

allegedly told that an extended engine warranty was available for purchase from Peninsular Diesel, the manufacturer of the engines. At the conclusion of the second viewing, plaintiffs left a $500 deposit with Robie, taking a copy of the proposed Purchase and Sale Agreement to review.

Prior to entering into the Agreement, plaintiffs claim that they requested further information from Robie about warranties on the Vessel, including warranties on the two diesel engines and protection against gelcoat blistering. In response, they were allegedly assured that TPI stood behind the Vessel and that they would receive written warranty information prior to closing. Robie allegedly reiterated that the engines were warranted by TPI for the first season, and an "extended warranty" was available from Peninsular Diesel if plaintiffs wished to purchase it. According to plaintiffs, Robie convinced them that it would not be necessary to survey the Vessel or the engines, since the boat was a demonstrator with very light use. Plaintiff Kelly also asserts that he had a telephone conversation with Mark Pearson ("Pearson") of TPI, in which Pearson assured him that Peninsular Diesel would stand behind the engines.

Plaintiffs and TPI, through Robie, eventually agreed to the sale of the Vessel for $64,000. In addition to the standard terms set forth in the Purchase and Sale Agreement, plaintiff Kelly added a clause in his own handwriting stating that, "If engine warranty is not taken, Buyer may have engines inspected prior to closing." In the end, however, plaintiffs neither took the engine warranty nor elected to have the engines inspected prior to purchase.

Plaintiffs completed purchase of the Vessel and took possession in May of 1991. According to plaintiffs, they inquired of Robie both prior to and after the closing regarding the expected warranty paperwork. Approximately three weeks after the closing, Robie presented plaintiffs with a limited warranty covering the gelcoat and the overall structure of the hull, which they executed and returned to TPI, believing it was an affirmation of the hull and blistering warranty. Plaintiffs claim that they did not understand that the document they were executing was actually a limitation of all warranties. Plaintiffs never received any written warranty for the remainder of the systems or the engines.

Plaintiffs immediately began to have mechanical problems with the Vessel, including oil leaks, defective gauges, broken plumbing hoses, and overheating problems with the engines. Unbeknownst to plaintiffs, TPI had experienced similar engine overheating when it had used the Vessel prior to its purchase by plaintiffs. Also unbeknownst to plaintiffs, the cooling problems as well as other engine deficiencies had been discovered by Peninsular Diesel in this line of diesel engines and TPI had been made aware of these defects, but had failed to correct them prior to the sale.

In October of 1991, plaintiffs, through their attorney, contacted TPI and revoked acceptance of the Vessel pursuant to the Uniform Commercial Code, Rhode Island General Laws § 6A–2–608.

After extensive negotiations, plaintiffs and TPI settled their dispute and plaintiffs re-accepted the Vessel in January of 1992. (YHQ was not involved in the settlement negotiations between plaintiffs and TPI.) In the Settlement Agreement, TPI agreed to purchase an extended engine warranty from Peninsular Diesel (which plaintiffs allege TPI failed to do until four months after launch of the Vessel); to haul and store the Vessel indoors for the winter of 1991–92; to winterize the Vessel in accordance with normal standards (plaintiffs allege a failure to winterize to normal standards); to commission and launch the Vessel in the spring; to make a slip available for one week following the launch of the Vessel and to permit plaintiffs to operate the Vessel during that week to ensure that it was in good operating condition (plaintiffs allege that TPI failed to commission and dewinterize the Vessel for six days following the launch); to prepare a complete history of the Vessel (plaintiffs allege that all histories received were incomplete); to fill and winterize the diesel fuel tanks at plaintiffs' expense (TPI failed to do this, a failure which TPI claims resulted from a malfunctioning fuel gauge which indicated that the tanks were full); to buff out scratch

marks on the hull caused by rubbing of the fenders while in storage; and to pay $2,000 to plaintiffs in settlement of their claims with respect to the Vessel.

Prior to execution of the Settlement Agreement, plaintiffs received a history of the Vessel (after rejecting an initial version as insufficient) which indicated that the Vessel's engines had been used for approximately 60 to 85 hours before plaintiffs purchased the Vessel. The history stated that there had been problems with the engines, but plaintiffs allege that the history failed to disclose that the engines had previously been installed in another boat.

Plaintiffs continued to experience problems with the Vessel and revoked acceptance again in June of 1992. In July of 1992, plaintiffs filed this suit seeking to recover damages and to void both the original Purchase and Sale Agreement and the Settlement Agreement. The parties engaged in oral argument on May 21, 1993, and the matter was taken under advisement. It is now in order for decision.

## DISCUSSION

### I. Plaintiffs' Complaint

Counts I and VI of the complaint seek judgment against both YHQ and TPI based on contract: Count I alleges breach of the Settlement Agreement entered into by plaintiffs and TPI; Count VI asks that the Court declare as "void *ab initio*" the Purchase and Sale Agreement for the Vessel and the subsequent Settlement Agreement between plaintiffs and TPI. Counts II and IV are directed against TPI and allege, respectively, fraudulent and negligent misrepresentation. Counts III and V are directed against YHQ and also allege, respectively, fraudulent and negligent misrepresentation.

### II. Standard for Summary Judgment·

■ Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991). Additionally, the moving party bears the burden of showing that no evidence supports the nonmoving party's position. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In order for defendants to prevail on their motion, they must show that no genuine issue of material fact exists to support plaintiffs' case. The motion can then be granted if, as a matter of law, defendants are entitled to judgment in their favor.

### A. Defendant YHQ

#### 1. The Misrepresentation Claims

In Count III, ¶ 41 of their complaint, plaintiffs allege that defendant "YHQ materially misrepresented the history of the vessel and the repairs to the engines to Plaintiffs, with knowledge of the falsity of said representations, with intent to deceive Plaintiffs and with the intent to induce Plaintiffs' reliance thereon." In Count V, ¶ 47 of their complaint, plaintiffs allege that defendant "YHQ negligently misrepresented the history, condition, seaworthiness and suitability of the Vessel." Therefore, these counts attempt to state causes of action for fraudulent and negligent misrepresentation, respectively.

■ The Rhode Island Supreme Court recently recognized the tort of negligent misrepresentation. *Estate of Braswell v. People's Credit Union,* 602 A.2d 510 (R.I.1992). In *Braswell,* the Supreme Court held that the trial justice had correctly allowed an action for negligent misrepresentation to be maintained against a credit union whose agent had negligently told the plaintiffs that their loan was insured.[2] The Court noted

---

**2.** Prior to this decision, the tort of negligent misrepresentation had been recognized by feder-

that the trial justice had properly looked for guidance to the Restatement (Second) of Torts, § 552(1) (1977), which provides that:

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Braswell,* 602 A.2d at 512. Thus, the recipient of information supplied by one paid for the information is entitled to expect the exercise of reasonable care and competence in ascertaining the facts and conducting such investigations as are necessary.

■ Unlike negligent misrepresentation, the tort of fraudulent misrepresentation or deceit is well established in Rhode Island law. To prove the elements of fraudulent misrepresentation, a plaintiff must demonstrate: 1) that the defendant made a false representation of material fact; 2) that the defendant intended thereby to deceive the plaintiff; 3) that the defendant intended that the plaintiff rely on the representation; 4) that the plaintiff did rely on the representation as true; and 5) that the plaintiff was injured as a result. *Banco Totta e Acores v. Fleet Nat'l Bank,* 768 F.Supp. 943, 947 (D.R.I.1991) (citing *Cliftex Clothing Co. v. Di Santo,* 88 R.I. 338, 148 A.2d 273 (1959)).

■ Plaintiffs' claims for negligent and fraudulent misrepresentation cannot survive in this case for a shared reason. Though the causes of action differ in some respects, under Rhode Island law one common element is needed to establish a prima facie case of either—the plaintiffs must have *justifiably relied* on the alleged misrepresentation negligently or fraudulently made by the defendant. *Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85, 91 (D.R.I.1968) (negligent misrepresentation); *Dowling v. Narragansett*

al courts applying Rhode Island law. *See, e.g., Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85, 91–2 (D.R.I.1968) (citing to the tentative draft of the Restatement (Second) of Torts, § 552); *Gale v.*

*Capital Corp.,* 735 F.Supp. 1105, 1124 (D.R.I. 1990) (negligent misrepresentation); *LaFazia v. Howe,* 575 A.2d 182, 185–6 (R.I.1990) (fraudulent misrepresentation); *East Providence Loan Co. v. Ernest,* 103 R.I. 259, 263, 236 A.2d 639, 642 (1968) (fraudulent misrepresentation).

Plaintiffs' misrepresentation claims here are controlled by the Rhode Island Supreme Court's decision in *LaFazia v. Howe,* 575 A.2d 182 (R.I.1990). In *LaFazia,* plaintiffs/sellers sued defendants/buyers for failing to make final payment on a note for the purchase of a delicatessen. The buyers counterclaimed, alleging they were induced to buy the operation by false and material misrepresentations made to them by the sellers concerning the delicatessen's past revenues. Before the sale, the buyers had examined the tax returns of the business and expressed concern over the low profits, but they were reassured by the sellers' verbal representations that in reality the business was more profitable than the records indicated. Consequently, the buyers agreed to the sale and signed a contract with the following disclaimers:

9. The Buyers rely on their own judgment as to the past, present or prospective volume of business or profits of the business of the Seller and does [sic] not rely on any representations of the Seller with respect to the same.

10. No representations or warranties have been made by the Seller, or anyone on its behalf, to the Buyers as to the condition of the assets which are the subject of this sale, and it is understood and agreed that said assets are sold 'as is' at the time of sale.

575 A.2d at 183. A standard merger clause was also included.

Distinguishing these specific disclaimer clauses from "general, nonspecific" disclaimer clauses, the *LaFazia* Court upheld summary judgment for the sellers, noting that the disclaimer clauses at issue disclaimed any

*Value Line, Inc.,* 640 F.Supp. 967, 971 (D.R.I. 1986); *Banco Totta e Acores v. Fleet Nat'l Bank,* 768 F.Supp. 943, 946–47 (D.R.I.1991).

representations as to the profitability of the business where the plaintiffs were asserting reliance on false representations as to the business's profits:

It is fundamental to actions predicated on the theory of deceit that the party claiming deceit present evidence that shows that he or she was induced to act because of his or her reliance upon the alleged false representations....

[Here] summary judgment was appropriate because the merger and disclaimer clauses preclude defendants from asserting that plaintiffs made material misrepresentations regarding the profitability of the business. The clauses prevent defendants from successfully claiming reliance on prior representations.

575 A.2d at 185 (citation omitted).

This Court relied on *LaFazia* in *Banco Totta e Acores v. Fleet Nat'l Bank*, 768 F.Supp. 943 (D.R.I.1991), which, like *LaFazia*, involved a disclaimer relating to the very matter about which the plaintiff claimed to have been defrauded—in this instance the creditworthiness of the borrower. This Court held that a disclaimer clause stating that the participant's decision to purchase a loan participation "was based solely upon its own independent evaluation of the Loan, the Borrower's creditworthiness and the value and lien status of the Collateral, and all other matters relating thereto" rendered legally irrelevant all misrepresentations innocently, negligently, or intentionally made before the participation agreement was signed. *Banco Totta*, 768 F.Supp. at 949. This Court noted that:

Having asserted in unambiguous contract language that it based its decision to participate in the loan 'solely upon its own independent evaluation,' BTA cannot now claim that it was relying upon Fleet's representations. Furthermore, the Court holds that if BTA did indeed rely on Fleet's representations, and not on its own appraisal, then that reliance was not justifiable in light of the contract between the parties.

*Banco Totta*, 768 F.Supp. at 949.

■ In the instant case, plaintiffs signed a contract with the following disclaimers:

2. The BUYER may have the YACHT surveyed at the BUYER's expense.... The BUYER agrees that the BROKERS cannot and do not warrant the accuracy of any information about the YACHT that the BROKERS may have offered or may hereafter offer and that the BROKERS do not warrant the condition of the

YACHT....

5. THE BUYER EXPRESSLY AGREES THAT THE YACHT (INVENTORY INCLUDED) IS OFFERED, AND WILL BE SOLD, ON AN 'AS IS' BASIS AND THAT NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, HAVE BEEN OR WILL BE MADE, DIRECTLY OR INDIRECTLY, CONCERNING THE CONDITION OR USE OF THE YACHT, OR ARE OR WILL BE BINDING UPON THE BROKERS OR THEIR AGENTS. THE BUYER FURTHER EXPRESSLY AGREES THAT HE HAS NOT RELIED UPON ANY ORAL REPRESENTATIONS BY THE SELLER OR THE BROKERS AS TO THE CONDITION OR CAPABILITY OF THE YACHT OR ITS INVENTORY. THE BUYER ALSO RECOGNIZES AND ACKNOWLEDGES THAT YACHTS AND THEIR INVENTORY MAY HAVE BOTH APPARENT AND/OR HIDDEN DEFECTS AND IT ACCEPTS RESPONSIBILITY FOR DETERMINING THE CONDITION OF THE YACHT, ITS INVENTORY AND THE EXISTENCE OF ANY DEFECTS.

In addition, the following merger clause was included in the Purchase and Sale Agreement:

15. This Agreement and attached Inventory shall constitute the entire agreement between the BUYER and SELLER and merges and supersedes all prior discussions, agreements and understandings of any nature between them ... Neither the BUYER nor the SELLER shall be bound by any condition, covenant, warranty or representation except as expressly set forth in this Agreement....

The Agreement also contains a clause recognizing defendant YHQ and Theodore Robie as the brokers of the Vessel.

In light of the contract between plaintiffs and TPI, even if Robie did make representations and plaintiffs relied on Robie's representations, that reliance was not justifiable. As in *LaFazia* and *Banco Totta*, the parties used specific disclaimer language regarding the very matter concerning which plaintiffs now claim they were defrauded—the condition and use of the Vessel. Paragraph 5 of the Purchase and Sale Agreement specifically declares that the buyers are not relying on any representations of the sellers or the brokers regarding the condition or use of the yacht and that the buyer "accepts responsibility for determining the condition of the yacht." Plaintiffs, like the plaintiff in *Banco Totta*, have asserted in unambiguous contract language that their decision was based on their own independent determination.

■ Paragraph 5 of the Purchase and Sale Agreement further states that no warranties have been made by the sellers or the brokers regarding the condition or use of the yacht and that the yacht is sold "as is" at the time of sale. Again, plaintiffs have in plain language stipulated that they were not relying on any representations as to the very matters about which they now claim they were mislead. While an "as is" clause does not denote an exclusion of tort liability, *Silva v. Stevens*, 156 Vt. 94, 112, 589 A.2d 852, 862 (1991), and, thus, does not operate contractually to bar plaintiffs' misrepresentation claims, such a specific disclaimer does destroy any allegation that plaintiffs reasonably relied on contrary oral representations. *See LaFazia*, 575 A.2d at 186.

■ Plaintiffs' complaint contained no allegations that they had not read the Purchase and Sale Agreement. (In fact, plaintiffs insisted on taking that Agreement home to read before executing it after insertion of additional language). Plaintiffs have not alleged that they did not understand the merger and disclaimer clauses or that the clauses had been procured by fraud. *See LaFazia*, 575 A.2d at 186. Nor is there any allegation that the Vessel was not made available for inspection. In fact, the contract made it clear that plaintiffs should make an investigation and act on their own judgment. The following clause providing for plaintiffs to survey the Vessel was included in the Purchase and Sale Agreement:

2. The BUYER may have the YACHT surveyed at the BUYER's expense on or before N/A, 19—.... The SELLER agrees that the BUYER or its agent(s), including any surveyor(s) engaged by or on behalf of the BUYER, may investigate in a non-destructive manner such information about the YACHT as the BUYER wishes.

This clause should have put plaintiffs on notice that they were assuming the risk of defects that such an examination would have revealed. *See, e.g., Munkres v. McCaskill*, 64 Kan. 516, 68 P. 42 (1902).

To be sure, plaintiffs' concern about the engines is evidenced by the clause they inserted into the Purchase and Sale Agreement whereby they reserved the right to have the engines surveyed prior to closing if they chose not to take the extended engine warranty. Nonetheless, plaintiffs ultimately elected neither to request an extended engine warranty nor to have the engines surveyed. While plaintiffs assert that they pursued this course of action in reliance upon Robie's verbal representations that the engines would be fully warranted for the first season of use, they did so in the face of express contract language stating that they were not relying on any external representations. Since the Purchase and Sale Agreement prevented any reliance on oral representations regarding the condition or use of the Vessel, plaintiffs were acting on their own judgment and they have no one to blame but themselves. *See, e.g., French v. Isham*, 801 F.Supp. 913, 922 (D.R.I.1992) ("[H]is [plaintiff's] fraud claims survive only if defendants unconditionally refused to allow him to fully inspect the house. If plaintiff's failure to fully inspect the premises arose from his own frugality and not from defendants' deceit, he has no one to blame but himself.")

■ Additionally, with respect to the claim of fraudulent misrepresentation, there are insufficient facts alleged to indicate that Robie was aware of the Vessel's problematic

history or that the history of the Vessel was in any way different from that which he represented to plaintiffs. (In fact, plaintiffs' own pleadings allege that Pearson told Robie that the Vessel had been in a single boat show.) It is purely speculative to suggest that scienter could be inferred from the fact that the Vessel was located at the same marina as YHQ, and the fact that Robie and Pearson were neighbors. It is true that Robie stood to profit if the sale of the Vessel went through, and a jury would be entitled to consider Robie's motive to profit as circumstantial evidence of scienter and an intent to deceive. *Fleet Nat'l Bank v. Anchor Media Television, Inc.,* 831 F.Supp. 16, 40 (D.R.I. 1993); *see also Fricke v. Fricke,* 491 A.2d 990, 994 (R.I.1985) (intent to deceive can be established through circumstantial evidence). However, this Court concludes that there is insufficient evidence in this case to support a jury finding of scienter on Robie's part. Thus, plaintiffs' fraudulent misrepresentation claim also fails because plaintiffs have not shown facts which indicate that Robie knew the statements he made were false and that they were intended to deceive. *See Cliftex Clothing Co. v. Di Santo,* 88 R.I. 338, 344, 148 A.2d 273, 275–76 (1959).

Having viewed the factual materials in the light most favorable to plaintiffs, the Court opines that there is no issue of material fact with respect to the misrepresentation claims against YHQ. Because a key element, justifiable reliance, cannot be established as part of plaintiffs' misrepresentation claims with respect to YHQ, these counts fail to pass muster.[3] The Court, therefore, grants defendant YHQ's motion for summary judgment on Counts III and V of the complaint.

### 2. Contract Claims

Count I of the complaint seeks recovery against both TPI and YHQ due to breach of the Settlement Agreement entered into by plaintiffs and TPI. Count VI requests that the Court declare as "void *ab initio*" the original Purchase and Sale Agreement for the Vessel and the subsequent Settlement Agreement between plaintiffs and TPI.

Plaintiffs entered into two contracts which are relevant to this case: the first was the Purchase and Sale Agreement for the Vessel, the second was the Settlement Agreement between plaintiffs and TPI. Plaintiffs' contract claims against YHQ must fail since YHQ was not a party to either of the two contracts at issue.

The first sentence of the Purchase and Sale Agreement sets forth in clear and unambiguous language the parties thereto:

THIS IS AN AGREEMENT (the 'Agreement') made by and between Tillotson Pearson Inc. of Warren, R.I., a U.S. corporation (the 'SELLER'), owner of the Rampage 28 # 192 called the 'No Name' (the 'YACHT'), and Bruce Kelly and Jeanne Heslop of Orr's Island, Maine, a citizen of U.S. [sic] (the 'BUYER').

Consistent with this clause, the Purchase and Sale Agreement is signed by TPI as the "SELLER" and plaintiffs as the "BUYER."

Likewise the first sentence of the Settlement Agreement sets forth in clear and unambiguous language the parties thereto: "THIS AGREEMENT by and between TILLOTSON–PEARSON, INC., a Rhode Island corporation ('TPI') and BRUCE V. KELLY and JEANNE S. HESLOP (collectively, the 'Owner') entered into as of the —— day of January, 1992." [Blank space in the origi-

---

3. In addition, even if plaintiffs were able to establish that they justifiably relied on the alleged misrepresentations of YHQ, their reacceptance of the Vessel after the initial revocation has wiped the slate clean with respect to any action plaintiffs may have had against YHQ. *Ralston Dry–Wall Co. v. United States Gypsum Co.,* 926 F.2d 99, 102 (1st Cir.1991) (first actor not proximate cause of the harm if forces set in motion by the actor come to rest in position of safety and new force intervenes). Even if YHQ made actionable misrepresentations, the forces set in motion by such representations came to rest after plaintiffs

reaccepted the Vessel with actual knowledge of all matters claimed misrepresented. *Almeida v. Town of North Providence,* 468 A.2d 915, 917 (R.I.1983) ("[I]f ... the intervening cause was not reasonably foreseeable, the intervening or secondary act becomes the sole proximate cause of the plaintiff's injuries."). YHQ could not have reasonably foreseen the problems with the Vessel that led to the second revocation of acceptance and any misrepresentation made by YHQ could not have been the proximate cause of any loss suffered by plaintiffs.

nal.] The last sentence of the Settlement Agreement also indicates that the parties are the Owner (plaintiffs) and TPI: "IN WITNESS WHEREOF, TPI and the Owner have executed this Agreement as of the day and the date first above written." The Settlement Agreement is signed by plaintiffs and by an executive vice president of TPI.

Determining whether or not a contract is ambiguous is, like other questions of contract construction, a question of law for the Court. *In re Navigation Technology Corp.*, 880 F.2d 1491, 1495 (1st Cir.1989). Where, as here, a contract is clear and unambiguous on its face, the role of the Court is to enforce the contract as written. *Aetna Casualty & Sur. Co. v. Graziano*, 587 A.2d 916, 917 (R.I.1991) (task of judicial construction is at an end where clear and unambiguous contract language controls).

In the instant case, it is clear that YHQ was not a party to either the original Purchase and Sale Agreement or the Settlement Agreement. As a non-party, YHQ is not bound by the contracts and plaintiffs cannot successfully assert a cause of action against YHQ for breach of the terms thereof. *Hessee Industries, Inc. v. Chemical Bank*, 508 F.Supp. 319, 323 (S.D.N.Y.), *aff'd mem.*, 661 F.2d 909 (2d Cir.1981) (an action for breach of contract will not lie against non-parties to the contract); *Comly v. First Camden Nat'l Bank & Trust Co.*, 22 N.J.Misc. 123, 36 A.2d 591, 593 (1944) ("[A]s a general rule an action on a contract cannot be maintained against a person who is not a party to it.").

Plaintiffs also assert in their memorandum that YHQ made express warranties. Such warranties are contractual in nature, 67A Am.Jur.2d *Sales* § 690 (1985), and since this Court has already determined that YHQ was not a party to the Purchase and Sale Agreement, these assertions are not barred by the parol evidence rule. *See American Underwriting Corp. v. Rhode Island Hospital Trust Co.*, 111 R.I. 415, 421, 303 A.2d 121, 124 (1973).

While an agent acting on behalf of a known principal is usually not personally liable for acts done within the scope of his or her authority, the agent may incur personal liability by either expressly or impliedly warranting goods in such a manner that the warranty will be enforceable against the agent. *C.C. Plumb Mixes, Inc. v. Stone*, 108 R.I. 75, 76, 272 A.2d 152, 154 (1971) (citing *McCarthy v. Hughes*, 36 R.I. 66, 88 A. 984 (1913)). For Robie to have provided his own independent warranty, however, there must be evidence that he intended to provide an independent warranty. *See, e.g., Sealy v. McElroy*, 288 Ala. 93, 104, 257 So.2d 340, 350 (1972) ("An agent is presumed ... to incur no personal liability and unless an intention to substitute or superadd his personal liability for or to that of his principal is clearly shown, he will not be bound in his individual capacity."). There is no evidence of such an intention in this record.

Since plaintiffs have brought a contract action against YHQ, an entity not a party to either of the contracts, and there is no evidence that Robie intended to provide an independent warranty, summary judgment for defendant YHQ on Counts I and VI is accordingly granted.

### B. Defendant TPI

#### 1. Effort to Void the Contracts

Count VI of the complaint asks that the Court "declare that the Purchase and Sale Agreement and the Settlement Agreement are void *ab initio*."[4]

As the Rhode Island Supreme Court explained in *Halpert v. Rosenthal:*

> In this jurisdiction a party who has been induced by fraud to enter into a contract may pursue either one of two remedies. He may elect to rescind the contract to recover what he has paid under it, or he may affirm the contract and sue for damages in an action for deceit.
>
> The distinction between a claim for damages for intentional deceit and a claim for rescission is well defined. Deceit is a tort

---

4. While this count prays for relief against both defendants, this Court addresses said relief only with respect to defendant TPI since the Court has already determined that defendant YHQ was not a party to either of the contracts at issue.

action, and it requires some degree of culpability on the misrepresenter's part. An individual who sues in an action of deceit based on fraud has the burden of proving that the defendant in making the statements knew they were false and intended to deceive him. On the other hand, a suit to rescind an agreement induced by fraud sounds in contract.

*Halpert,* 107 R.I. 406, 412, 267 A.2d 730, 733 (1970) (citations omitted).

The Rhode Island Supreme Court further explained in *LaFazia v. Howe* that, "[T]he tort claim and the claim for rescission afford alternative sources of relief in which, if one is granted, the other is withheld. Thus one cannot recover on both theories." *LaFazia,* 575 A.2d at 184 (citation omitted).

■ In the instant case, the option of rescinding the Settlement Agreement is not available to plaintiffs since TPI has performed work under the Agreement. As this Court wrote in *Banco Totta:*

> Rescission is appropriate only when both parties to the contract can be restored to the status they occupied prior to the contract 'provided no rights of third parties have intervened, and provided that any benefits received under it can be restored, so that the parties can be replaced in their original positions.' *Turner v. Domestic Investment and Loan Corp.,* 119 R.I. 29, 33, 375 A.2d 956 (1977).

*Banco Totta,* 768 F.Supp. at 947–48 (citation omitted).

These restrictions on the availability of rescission are fatal to plaintiffs' efforts to void the Settlement Agreement and, thus, the Purchase and Sale Agreement. By plaintiffs own admissions, TPI stored the Vessel for the winter, winterized the Vessel, launched the Vessel, commissioned and dewinterized the Vessel, and transported the Vessel to have repairs effected. These services performed clearly prevent defendant TPI from being "restored to the status it occupied prior to the contract" with plaintiffs. As a result, rescission is inappropriate here and plaintiffs' effort to void the Settlement Agreement must fail. Accordingly, summary

judgment is granted to TPI with respect to Count VI of the complaint.

2. The Misrepresentation Claims

Since rescission is not available to plaintiffs, plaintiffs' only option is to affirm the Settlement Agreement and seek damages for the breach thereof. *See Halpert,* 107 R.I. at 411, 267 A.2d at 733.

■ Having thus affirmed the Settlement Agreement, plaintiffs are barred by the very terms of the Agreement from maintaining fraudulent and negligent misrepresentation claims against TPI for any alleged misrepresentations which may have occurred prior to the date of the Settlement Agreement. Plaintiffs executed a general, all-encompassing release by which they settled all claims against TPI. The language of the Settlement Agreement is clear and unambiguous. Paragraph Eight of the Settlement Agreement states:

> [T]he Owner [plaintiffs] hereby releases and quit-claims unto TPI any and all claims, damages, causes of action, or any other liability whatsoever from the beginning of the world to the date of this Agreement whether known or unknown, fixed or contingent and arising in any way, manner or form.... The Owner [plaintiffs] acknowledges and agrees that they have entered into this Agreement and this paragraph knowingly and intentionally waiving certain rights to which they may entitled [sic] under applicable law.

Given the clear terms of the release, plaintiffs are barred from maintaining any claim for misrepresentation arising before the date of the Settlement Agreement. Since the Settlement Agreement only bars claims accruing prior to the date of the Agreement, however, plaintiffs might be able to maintain a cause of action for misrepresentations which occurred after the date of the Settlement Agreement.

■ Plaintiffs do allege that subsequent to the Settlement Agreement, in reliance on Pearson's representations that the Vessel was running well and had been fully inspected, they took the Vessel on a trip on which they encountered engine difficulty necessitating commercial towing. Plaintiffs, however, have not alleged facts sufficient to

support a jury finding of scienter and intent to deceive. Thus, they are barred from maintaining a cause of action for fraudulent misrepresentations occurring subsequent to the date of the Agreement. · Plaintiffs' might be able to maintain a cause of action for negligent misrepresentations occurring after the date of the Settlement Agreement, but recovery in such a case would be limited to the pecuniary loss they suffered, *Gale v. Value Line, Inc.*, 640 F.Supp. 967, 972 (D.R.I.1986), and it is undisputed that TPI paid for the towing. Plaintiffs have, thus, failed to postulate facts sufficient to support a cause of action for misrepresentation accruing after the date of the Settlement Agreement.

■■■ Given plaintiffs' explicit release of any claims occurring before the date of the Settlement Agreement and their failure to allege facts sufficient to support a cause of action for misrepresentations negligently or fraudulently made after the date of the Agreement, plaintiffs' misrepresentation claims against defendant TPI must fail.

It is also to be noted that, even if the release were capable of being rescinded, the Settlement Agreement is valid according to the test for measuring the validity of a release set forth by the Supreme Court of Rhode Island in *Guglielmi v. Rhode Island Hosp. Trust Fin. Corp.*, 573 A.2d 687 (R.I. 1990).

■■■ In *Guglielmi*, the plaintiff sought to circumvent the clear terms of a settlement agreement by alleging fraud in the inducement and actual harm. The Supreme Court affirmed the trial court's grant of summary judgment for the defendant, setting forth the criteria to be used in evaluating the effectiveness of a release:

The validity of a release must be determined in light of three factors: (1) the existence of consideration for the release, (2) the experience of the person executing the release, and (3) the question of whether the person executing the release was represented by counsel.

*Guglielmi*, 573 A.2d at 689.

It is undisputed that plaintiffs were represented by counsel and received consideration to relinquish all claims—plaintiffs so stipulate in the release itself. Paragraph eight of the release states that plaintiffs have "been compensated by TPI in consideration of this release" and acknowledge "that they have been represented by legal counsel with respect to this Agreement and this paragraph, and that the meeting [sic] and intent of this paragraph have been explained to them by such legal counsel." Not only were plaintiffs represented by counsel, but they were represented by an attorney who had experience as a yacht broker prior to entering the legal profession.

With respect to the second element—the experience of the person executing the release—plaintiffs owned several boats prior to the purchase of the Vessel. Plaintiffs had experience negotiating the purchase of new, used as well as demonstrator boats.[5]

The Court in *Guglielmi* further noted that: Finding satisfactory answers to these questions, the court will find a release to be valid and binding unless it has been procured through fraud, misrepresentation, overreaching, or a material mistake on the part of either party.

*Guglielmi*, 573 A.2d at 689 (citation omitted).

Plaintiffs allege that the release was procured by TPI because the history of the Vessel provided was materially deficient in

---

**5.** Plaintiffs in their memorandum note the Supreme Court of Rhode Island's reliance in *Guglielmi* upon the finding of the trial justice that, " '[A]t the time Plaintiffs executed the release, they had all of the knowledge of the facts surrounding the release.' " *Guglielmi*, 573 A.2d at 690. Plaintiffs argue that this Court cannot find that they had knowledge of all facts surrounding the Settlement Agreement with TPI. However, the test proffered by the *Guglielmi* Court calls for the court to consider the "experience", not the "knowledge", of the person executing the re-

lease. This distinction is buttressed by the fact that the *Guglielmi* Court upheld the trial court's finding of full "knowledge" despite the fact that the plaintiffs had alleged they had purchased the land under the belief that it contained substantially more acres than it actually did. The Court dealt with this allegation under the rubric of whether the release could be set aside for misrepresentation once the court had found consideration, experience and representation by counsel.

 

that it failed to mention that the engines had previously been installed in another boat.[6] While there may have been some misrepresentations which accompanied the release, a jury could not rationally find that plaintiffs reasonably relied upon such misrepresentations to their detriment. At this time, plaintiffs were clearly on notice that the Vessel was plagued with difficulties and that the history of the Vessel may well have been different from that being represented. Plaintiffs were fully aware that the engines were not functioning properly, whether they had been installed in another vessel or not. Plaintiffs had every opportunity to survey the Vessel, yet they chose not to do so. They elected to take their chances, evidently believing that the compensation they were receiving was sufficient. Plaintiffs signed the release with full knowledge that within the four corners of the release lurked the abandonment of any claims they had with respect to the Vessel. The Court, thus, concludes that based on the undisputed facts the Settlement Agreement is valid and binding as a matter of law.

Defendant TPI's motion for summary judgment is accordingly granted with respect to Counts II and IV, which allege, respectively, fraudulent and negligent misrepresentations on TPI's part.

3. Breach of the Settlement Agreement

 Count I alleges breach of the Settlement Agreement entered into by plaintiffs and TPI. Whether TPI breached the Settlement Agreement clearly presents questions of fact and, thus, summary judgment is not appropriate on this issue. A jury could find that TPI has not fulfilled all of its obligations under the Settlement Agreement, or that the obligations were not fulfilled within a reasonable time. Since the Settlement Agreement is generally silent with respect to time, all work would have to be completed within a reasonable time. It is obviously a question of fact for the jury as to what was reasonable under the circumstances. *See, e.g., Fleet Nat'l Bank v. Anchor Media Television, Inc.*, 831 F.Supp. at 34 ("Where, as here, terms are not defined in a contract, it is for the jury to determine whether there has been a breach of contract."). Therefore, TPI's motion for summary judgment on Count I is denied.

*Conclusion*

For the reasons stated above, defendant YHQ's motion for summary judgment is hereby granted with respect to all Counts and defendant TPI's motion is granted with respect to Counts II, IV and VI and denied with respect to Count I. No judgment will enter until all claims are resolved.

It is so ordered.

---

**6.** Paragraph four of the Settlement Agreement states: "TPI will prepare a statement of the history of the Yacht, including a detailed list of any repair to the Yacht and equipment that was installed by TPI or its agents after completion of the Yacht."